301 Ga. 678
FINAL COPY

S17A0705.  BOOTH v. THE STATE.

PETERSON, Justice.

Delroy T. Booth was convicted of malice murder and other crimes in connection with the death of Shantle Vason.[1] Booth appeals and argues that the trial court erred by: (1) reading the indictment to a competency jury; (2) allowing the State to make improper arguments during closing statements; (3) admitting evidence of other acts to prove intent in this case; and (4) merging instead of vacating the felony murder counts. We vacate the merger of the felony murder counts and otherwise affirm Booth's convictions.

---

[1] The crimes occurred in February 2007. On September 22, 2011, a DeKalb County grand jury indicted Booth for malice murder, two counts of felony murder, aggravated sodomy, aggravated sexual battery, and aggravated assault. Booth entered a plea of incompetency, but a special jury found him competent to stand trial. Following a jury trial in February and March 2013, Booth was acquitted of aggravated sodomy, but found guilty on all other charges.  The trial court sentenced Booth to life in prison for the malice murder conviction and a consecutive term of life imprisonment for the aggravated sexual battery conviction, merged the aggravated assault count with the malice murder conviction, and "merged" the two felony murder counts with the malice murder count. On March 28, 2013, Booth filed a timely motion for new trial, which he subsequently amended, and the trial court denied the motion on July 24, 2015.  Booth filed a timely notice of appeal, and the case was docketed to this Court for the term beginning in April 2017 and submitted for a decision on the briefs.

Viewed in the light most favorable to the verdict, the trial evidence showed the following. Sometime in December 2006, Booth began dating Vason, who had been diagnosed with an intellectual disability. In early February 2007, police were called out to Booth's apartment on multiple occasions. One 911 call was made by Booth's roommate who reported that Booth had assaulted Vason; another call was made by Vason's mother, Evelyn Rosemond, when Booth refused to allow Rosemond to see her daughter.

At some point, Vason began seeing someone else. On the morning of February 24, 2007, Booth called a friend from Vason's cell phone and admitted to being inside Vason's apartment and having an argument with her about another man. Booth also called Vason's sister, admitting that he had gotten into an argument with Vason and taken her phone so she could not call anyone. Booth told Vason's sister that Vason was cheating on him, apologized because he "couldn't deal with her," and said he was going to call Vason's mother so he could apologize to her, as well. Sometime later, Booth spoke to Rosemond on Vason's cell phone. Booth told Rosemond that he was leaving Vason because she was cheating on him and she was "slow." Rosemond asked to speak with Vason, but Booth claimed he was not with Vason and was in a different part of

2

town. Cell phone records showed, however, that Vason's cell phone, which Booth was using, was near a cell phone tower close to Vason's apartment.

Later that day, Booth called 911 and reported that Vason had been assaulted. When police responded to Vason's apartment, they found Booth attempting to do CPR on Vason, who was gasping for air. She was naked and partially covered by a sheet, and the exposed portions of her body revealed significant bruising, including to her neck, face, legs, and arms. Her eyes were swollen shut, her left arm was swollen, and her buttocks were bleeding. After being transported to a local hospital, Vason was airlifted to a trauma unit, where doctors determined that she had lost all brain function due to traumatic brain injuries. Vason remained on life support for several hours but was eventually disconnected and died from her injuries.

Booth told police officers at the scene that he went to Vason's apartment to check on her after her mother expressed concern that she had not heard from Vason. Booth said he found Vason fully clothed in a state of distress, undressed her to treat her injuries and to put ice packs on the bruising, and called 911 when she became unresponsive. Police did not see any ice packs in the area. Booth had speckles of blood on his shirt that DNA analysis later revealed was Vason's.

3

After arresting Booth and taking him to the police station, police noticed that Booth's right hand was red, swollen, and bruised.

While searching Vason's apartment, police observed signs of a struggle, including a broken frame, broken glass throughout the apartment, damaged blinds, and blood on an end table, in the kitchen, and on the mattress in the bedroom where Vason was found. Officers also found a box in the garbage that contained a candle covered in feces.

A medical examiner conducting an autopsy on Vason concluded that Vason had numerous blunt force injuries and abrasions across her body, she had injuries on her hand consistent with defensive wounds, and had extensive hemorrhaging on both sides of her head. The medical examiner concluded that although Vason's extensive injuries were incompatible with life, her head injuries were the likeliest cause of her death. The medical examiner also determined that the feces-covered candle was the likely cause of injuries found inside Vason's rectum, and that the bruising on Vason's buttocks was consistent with a forceful attempt to expose her anus.

Before Vason died, medical personnel collected DNA samples from Vason's genital and rectal areas. A GBI analyst compared those DNA samples

4

with DNA samples taken from Booth by evaluating 16 locations in the DNA profiles. A semen sample taken from Vason's rectal area was a 16-location match for Booth's DNA. The swab taken from Vason's genital area indicated the presence of two DNA profiles in addition to Vason's DNA profile. One of the other profiles was a partial match for Booth, but the other was not.

1. Booth does not challenge the sufficiency of the evidence. Nevertheless, as is our customary practice in murder cases, we have independently reviewed the record and conclude that the evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Booth was guilty of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Booth argues that the trial court plainly erred by reading the indictment in its charge to the special jury determining Booth's competency to stand trial. Although Booth did not object to the charge at the time, he now argues that the criminal charges and the allegations of how the crimes were committed were irrelevant and prejudicial to the jury's determination of the issue. We disagree.

Where, as here, a party fails to object to a jury charge, we review the issue for plain error pursuant to OCGA § 17-8-58 (b). There are four prongs in the test for plain error.

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

State v. Kelly, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (citations and punctuation omitted).

The trial court made no error, much less plain error, in reading the indictment to the jury during the competency hearing. At issue in a competency proceeding is whether

> a defendant is capable at the time of the trial of understanding the nature and object of the proceedings going on against him and

6

rightly comprehends his own condition in reference to such proceedings, and is capable of rendering his attorneys such assistance as a proper defense to the indictment preferred against him demands.

Lewis v. State, 279 Ga. 69, 70 (3)  (608 SE2d 602) (2005) (citation and punctuation omitted). Whether a defendant understands the nature and gravity of the charges against him is highly relevant to the competency proceeding. Black v. State, 261 Ga. 791, 794 (2) (410 SE2d 740) (1991). Because the indictment provided information about the nature and gravity of the charges against Booth, the trial court made no error in reading the indictment to the special jury where it otherwise properly charged the jury on its duty to determine Booth's competency. See Waldrip v. State, 267 Ga. 739, 743 (6) (482 SE2d 299)  (1997) (trial court did not err in allowing the State to repeatedly refer to the pending charges against a defendant at the competency proceeding; the nature of the charges was relevant to the competency determination and the court properly charged the jury on its role), abrogated on other grounds as

recognized by <u>Archie v. State</u>, 248 Ga. App. 56, 57 (1) n.3 (545 SE2d 179) (2001).

3. Booth argues that the trial court erred by admitting evidence of other acts for the purpose of proving his intent to commit the charged crimes. We disagree.

The other acts evidence involved Booth's assault and battery of ex-girlfriends. Traveaka Banks testified that, during the time she dated and lived with Booth, Booth became angry and hit Banks in the head and arms with his fist after she said she wanted to end their relationship. Ciara Hassell, another of Booth's ex-girlfriends, also testified that Booth was physically abusive during their relationship. Once, Booth became angry when he asked Hassell to use her food stamp card and she told him she did not have it. Booth threw things and then hit Hassell in the head. For this offense, Booth pled guilty to family violence battery. Hassell also said that about a week after the first incident, she and Booth were arguing about money when Booth hit her on the head with his hand and threw something that hit her in the back. Booth pleaded guilty to aggravated stalking and family violence battery for his acts during the argument.

We review a trial court's decision to admit other acts evidence for an abuse of discretion. See State v. Jones, 297 Ga. 156, 159 (1) (773 SE2d 170) (2015). For trials, like Booth's, that occur after January 1, 2013, the admissibility of other acts evidence is governed by OCGA § 24-4-404 (b) ("Rule 404 (b)"), which provides that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of . . . intent . . . ." For other acts evidence to be admissible, the moving party must show that: (1) the evidence is relevant to an issue other than the defendant's character, (2) the probative value is not substantially outweighed by undue prejudice under OCGA § 24-4-403, and (3) there is sufficient proof so that the jury could find that the defendant committed the acts. Jones, 297 Ga. at 158-159 (1); Bradshaw v. State, 296 Ga. 650, 656 (3) (769 SE2d 892) (2015). Rule 404 (b) is a rule of inclusion, but it does prohibit the introduction of other acts evidence when it is offered for the sole purpose of showing a defendant's bad character or propensity to commit a crime. See Jones, 297 Ga. at 160 (2); see also United States v. Covington, 565 F3d 1336, 1341 (II) (A) (11th Cir. 2009) ("Rule 404 (b) prohibits the

introduction of pure propensity evidence.");[2] Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 128 (5th ed. 2016) ("Rule 404 (b) is one of inclusion [that] allows extrinsic evidence unless it tends to prove only criminal propensity.").

Booth asserts an argument regarding only the first part of Rule 404 (b)'s three-part test. He argues that the other acts evidence, which he claims constituted no more than battery or simple battery, was not relevant to the issue of intent because the intent required for battery or simple battery was not the same as that for the offenses charged here.[3] He focuses specifically on the intent required for malice murder. Malice murder, however, is not the only crime for which he was prosecuted in this case and thus for which the State was required

---

[2] In considering Rule 404 (b), we take guidance from the decisions of the federal appellate courts, especially the United States Supreme Court and the Eleventh Circuit, in construing and applying the federal counterpart to our Rule 404 (b). See Olds v. State, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016).

[3] Booth does not claim that intent was not at issue. Indeed, intent was an issue at trial because Booth pleaded not guilty and did not affirmatively remove the issue of intent. See Hood v. State, 299 Ga. 95, 102 (4) (786 SE2d 648) (2016). Booth claimed that he found Vason in a state of distress after someone else committed the crimes against her. This "mere presence" defense forced the State to prove his criminal intent so as to negate any innocent explanation for his presence in Vason's apartment. See, e.g., United States v. Delgado, 56 F3d 1357, 1365 (11th Cir. 1995); United States v. Diaz-Lizaraza, 981 F2d 1216, 1224-1225 (11th Cir. 1993).

10

to prove intent. Booth was charged with other crimes, including aggravated assault, so we may consider whether the other acts were relevant to the issue of intent on any of these offenses.

The standard for relevance under the first prong of the Rule 404 (b) test is found in OCGA § 24-4-401 ("Rule 401"). See Olds v. State, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016). Under Rule 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. The test for relevance under Rule 401 is generally a liberal one, see Olds, 299 Ga. at 75 (2), keeping in mind that the relevance of other acts evidence

> is a function of the degree of similarity between the extrinsic act and the offense charged. In this regard, the extrinsic and the charged offense must have more than a mere characteristic in common; the common characteristic must be the significant one for the purpose of the inquiry at hand.

United States v. Dothard, 666 F2d 498, 502 (11th Cir. 1982) (citation and punctuation omitted); see also United States v. Beechum, 582 F2d 898, 911 (5th Cir. 1978). Where the relevant issue is intent, the other acts must have a similar intent as the charged offense. See Olds, 299 Ga. at 72 (2); see also United States

11

v. Williford, 764 F2d 1493, 1497 (11th Cir. 1985). We look to the intent of the crime charged to determine the admissibility of other acts, regardless of whether the charged offense is one requiring general or specific intent. See Jones, 297 Ga. at 162 (2).

Where the intent required for the charged offenses and other acts is the same, and intent is at issue, the first prong of the Rule 404 (b) test is satisfied. See Hood v. State, 299 Ga. 95, 101 (4) (786 SE2d 648) (2016) (uncharged sales of prescription pills were relevant where they had same intent as the charged offense of possession of a controlled substance with intent to distribute); Brannon v. State, 298 Ga. 601, 606-607 (4) (783 SE2d 642) (2016) (where defendant did not admit to knowing co-defendant killed the victim in order to steal his car, other acts evidence of a similar crime committed with co-defendant was relevant to establish criminal intent); Jones, 297 Ga. at 160-161 (2) (concluding that in trial for DUI offenses, which are general intent crimes, a prior DUI conviction was relevant on the issue of intent — the general intent to drive under the influence of alcohol); Bradshaw, 296 Ga. at 656-657 (3) (evidence showing that the defendant killed someone over a drug deal by shooting them in the head was relevant to establish intent in murder trial where

defendant was alleged to have shot two men in the head over a drug deal).[4] Olds

reminded us that relevance is a binary issue; evidence is either relevant or it is

not. Olds, 299 Ga. at 75 (2). Probative value, on the other hand, is a range; all

relevant evidence has some probative value, but not necessarily much.[5] Id. at 75-

76 (2). With these principles in mind, we turn to review whether the other acts

were relevant to the issue of intent on a charged offense.

Among the charged offenses, Booth was charged with aggravated assault

for assaulting Vason with his hands and unknown objects in an offensive

---

[4] This approach is consistent with the Eleventh Circuit's assessment of other acts' relevance to the issue of intent. See, e.g., United States v. Sterling, 738 F3d 228, 239 (11th Cir. 2013) (affirming admission of defendant's prior conviction for armed robbery because it was relevant to show intent on charged offense of using a firearm during the commission of a crime); United States v. Ellisor, 522 F3d 1255, 1267-1268 (11th Cir. 2008) (upholding admission of other acts evidence showing an intent to defraud by promoting an illusory show where defendant was charged with mail fraud over a similar scam); United States v. Matthews, 431 F3d 1296, 1311 (11th Cir. 2005) (arrest for distribution of cocaine was relevant to intent on charged offense of conspiracy to distribute cocaine); United States v. Parr, 716 F2d 796, 804-805 (11th Cir. 1983) (affirming admission of failure to pay credit card bills as evidence of "the intent to create an illusion of value thereby obtaining something for nothing" as relevant in trial on charges of violation of counterfeiting statutes and conspiracy to violate the same where the intent to defraud was the same); Dothard, 666 F2d at 503 (concluding that trial court erred in admitting certain other acts evidence because it did not show a specific intent to deceive by making a false or fraudulent statement, the intent required for the charged offense).

[5] Even if evidence is relevant and, thus, satisfies the first prong of the Rule 404 (b) test, that does not mean the evidence would be admissible under the second prong of the Rule 404 (b) test — that the probative value of the evidence was not substantially outweighed by its unfair prejudice. Booth makes no argument on this prong and, thus, the issue is not before us.

manner that was likely to result in serious bodily injury. See OCGA § 16-5-21 (a) (2) ("A person commits the offense of aggravated assault when he . . . assaults . . . [w]ith a deadly weapon or with any object . . . which, when used offensively against a person, is likely to or actually does result in serious bodily injury"). Although aggravated assault can be charged in other ways that make the offense a specific intent crime, the manner in which it was charged here is a general intent crime, requiring proof only that Booth had the intent to (1) injure Vason (2) with a weapon, that weapon being Booth's hands (or an unknown object) when used in a manner likely to result in serious bodily harm. See Guyse v. State, 286 Ga. 574, 577 (2) (690 SE2d 406) (2010) (noting that assault with statutory aggravating factors of intent to rob, rape, or murder are specific intent crimes, but the aggravating factor of use of a deadly weapon is a general intent crime); see also Miller v. State, 275 Ga. 730, 732 (1) (571 SE2d 788) (2002) (hands are not considered deadly weapons per se, but jury may find them to be depending on their use, injuries inflicted, and other circumstances).

In the incident involving Banks, she testified that Booth hit her in the head and arms with his fist. Although very little detail was provided about this offense, the fact that Booth hit her multiple times, including at least once on the

14

head, would show an intent to injure with his hands in a manner likely to result in serious bodily harm. See Young v. State, 332 Ga. App. 361, 362 (2) (772 SE2d 807) (2015) (evidence that defendant struck victim in the head with his fists was sufficient to sustain conviction for aggravated assault, because it is a factual question as to whether fists were objects used in a manner likely to result in serious injury); Sims v. State, 296 Ga. App. 461, 463 (1) (675 SE2d 241) (2009) (same). That Booth intentionally hit another intimate partner in the head, which is likely to cause serious bodily injury, is relevant to show that he committed a similar act with the same sort of intent in this case. See Olds, 299 Ga. at 72 (2) ("[E]vidence that an accused committed an intentional act generally is relevant to show — the evidence, in other words, has *some* tendency to make more or less probable — that the same defendant committed a similar act with the same sort of intent, especially when the acts were committed close in time and in similar circumstances." (emphasis in original)); see also 2 Weinstein's Federal Evidence § 404.22 (1) (a) ("The requisite intent may be inferred from the fact that, after being involved in a number of similar incidents,

the defendant must have had a mental state that is inconsistent with innocence.").[6]

As to the two acts against Hassell, Booth pleaded guilty to committing the offense of family violence battery, and by doing so, admitted that he "intentionally cause[d] substantial physical harm or visible bodily harm to another." OCGA § 16-5-23.1 (defining battery and providing for an enhanced sentence for repeat offenders if battery is committed between persons living in the same household). The evidence shows that Booth committed these offenses by hitting Hassell on the head, either with his hand or an unknown object. These offenses thus show an intent to cause harm by hitting the victim in the head with hands or fists and such actions were likely to cause serious bodily injury. We concluded above that this was the same intent required to be proven for the aggravated assault charge here. Because the intent required for the other acts

---

[6] Admittedly, the line between propensity and intent is not a clear one. See Jones, 297 Ga. at 163 (3) ("We caution that . . . the often subtle distinctions between the permissible purposes of intent and knowledge and the impermissible purpose of proving character may sometimes be difficult to discern."); see also United States v. Pollock, 926 F2d 1044, 1048 (11th Cir. 1991) ("[W]hat appears to one person as propensity may be intent to another; the margin between is not a bright line."). Nevertheless, the case law is clear that once it is determined that the extrinsic offense requires the same intent as the charged offense, it is relevant. Jones, 297 Ga. at 161 (2).

16

and the charged offense of aggravated assault is the same, the first prong of the Rule 404 (b) test was satisfied. <u>Bradshaw</u>, 296 Ga. at 657 (3).[7]

4. Booth next argues that the trial court erred in overruling his objection to the State's allegedly improper comments during closing arguments. We disagree.

The State's allegedly improper comments stem from the testimony of Dr. Greg Hampikian, a defense expert in forensic DNA analysis. A closing argument is to be judged in the context in which it is made. <u>Adams v. State</u>, 283 Ga. 298, 302 (3) (e) (658 SE2d 627) (2008). During Dr. Hampikian's cross-examination by the State, the following exchange occurred:

> Q: [H]ow long does — how long can a DNA sample stay in the body so that it can be collected, a profile generated . . . for comparison?
> A: And I'm assuming you mean like a sexual assault sample —
> Q: Yes.
> A: — a vaginal or a rectal sample?
> Q: Vaginal, rectal's [sic].
> A: You know, I think — I think we — we always ask victim's [sic] if they've had consensual sex within 48 hours because within 48 hours you have a pretty good chance of getting some sort of profile.

---

[7] In the light of this conclusion, we need not determine whether the other acts evidence was relevant to other charged offenses.

17

In experimental situations I've seen people report out as far back as a week sometimes on a — especially on a cervical sample, but generally not much more. I mean, theoretically it could be a lot longer but in practical experience that would be about the range.

Q: 48 hours?

A: 48 to, you know, maximum say a — week in normal — in normal cases.

. . .

Q: So what's the 48-hour period?

A: That's — I mean, that's kind of the rule of thumb —

Q: Okay.

A: — that we all — we all ask, you know, victims if they've had consensual sex within 48 hours because we would — we would expect to see some remnant of that consensual partner if they ejaculated inside of the victim.

Q: Okay. Does the length of time affect how much of a profile you might get?

A: Yes.

Q: Okay. So the closer in time to the swab, the more of a profile you would get?

A: That's one of the factors that affects it. Absolutely.

Booth argues that the State mischaracterized Dr. Hampikian's testimony and asserted matters that were not in evidence when it made the following comments:

STATE: All right. Now — the DNA in the rectum. There was DNA in her rectum; in Shantle Vason's rectum. [The defense's] doctor agreed with the Georgia Crime Lab. They — the Georgia Crime Lab did good work in this case. The DNA in the rectum was a full DNA profile of the defendant. A full DNA profile. It hadn't been a breakdown, it wasn't a mixture, it wasn't a partial, it hadn't been

18

washed out, full DNA profile. If that candlestick had gone in Ms. Vason's rectum after the contribution of that sperm, it would have taken away from that full DNA profile.

DEFENSE: Your Honor, we're going to object this time. That has not gone up on the evidence.

COURT: All right. I'm going to overrule the objection. He can argue any reasonable inferences he deems appropriate. The jury will ultimately decide what they did and did not hear. You may continue. Overruled.

STATE: Ladies and gentlemen, the DNA profile was a full DNA profile. Their doctor Hampikian told you that the closer in time to the contribution, the more likely you are going to get a full DNA profile. The closer in time — this was their doctor, their witness with the Georgia Justice Project. The closer in time a contribution, the better it is you're going to get a full DNA profile. And remember the GBI analyst told you things that affect that is washing, time, going to the bathroom, changing clothes. Nothing affected this full DNA profile of her rectum. It was close in time; it was the most recent contribution because the one in her vaginal area was partial. Of the 16, I think we had testimony of 12 or 13 but it wasn't full, the unknown wasn't full. And you all can infer from that the one in the rectum was closer in time. Which means —

DEFENSE: Your Honor, we would object.

COURT: All right. I'll overrule the objection. I'm going to overrule the objection. The jury will hear — well strike that — will recall what they did and did not hear. He can argue whatever reasonable inferences he deem[s] appropriate. The jury will make the ultimate decision. You may continue.

STATE: Ladies and gentlemen, you all know which one was the full one and which one was the partial one. And you all heard the evidence from their doctor, the closer in time you're going to get a full.

19

Booth asserts that the State's argument improperly allowed the jury to believe that DNA evidence can be time-stamped. Contrary to Booth's claims, the State's comments were within the bounds of permissible closing arguments. "[A] prosecutor is granted wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion[.]" Scott v. State, 290 Ga. 883, 885 (2) (725 SE2d 305) (2012). Within that wide latitude, a prosecutor may "comment upon and draw deductions from the evidence presented to the jury." Johnson v. State, 296 Ga. 504, 508 (4) (769 SE2d 87) (2015). Given Dr. Hampikian's testimony that the passage of time is a factor that affects the ability to collect a more complete DNA profile, there was nothing impermissible about the State's argument that the partial DNA profile collected from Vason's vaginal area was more remote in time than the full DNA profile of Booth collected from Vason's rectum and, thus, was evidence of Booth's guilt in committing the aggravated sexual battery.

5. Booth asserts that the trial court erred by merging the two felony murder counts with the malice murder count and asks that we remand for resentencing. The State agrees that the trial court used the wrong nomenclature in purporting to "merge" the felony murder counts into the malice murder count,

20

see Favors v. State, 296 Ga. 842, 847-848 (5) (770 SE2d 855) (2015) (felony murder counts do not "merge" into malice murder verdict but are vacated by operation of law), but argues that a remand is unnecessary because there are no counts for which the trial court can enter a sentence on remand. We agree.

The predicate felonies in the felony murder counts were aggravated battery and abuse of a disabled adult. These predicate felonies were not separately charged and no verdict was rendered on them. We vacate the merger of the felony murder counts, but because the trial court's sentence was proper in all other respects, we need not remand for resentencing. See Atkinson v. State, 301 Ga. 518 (801 SE2d 833) (2017).

Judgment affirmed in part and vacated in part. All the Justices concur.

Decided August 14, 2017.

Murder. DeKalb Superior Court. Before Judge Adams.

Lee & Ziegler, Konrad G. W. Ziegler, for appellant.

21

Sherry Boston, District Attorney, Lenny I. Krick, Alvera A. Riley, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.