**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J. and SELF, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**September 27, 2017**

# In the Court of Appeals of Georgia

A17A1008. DAVIS v. THE STATE.                                    SE-031C

SELF, Judge.

Craig Davis appeals from his convictions of two counts of reckless conduct in violation of OCGA § 16-5-60 (c), contending (1) that the trial court erred by allowing evidence that he had previously infected another a person with HIV, rather than admitting only his previous nondisclosure of his HIV status, and (2) that his counsel provided ineffective assistance by submitting expert witnesses who opined about the validity of HIV testing. For the reasons explained below, we affirm.

*Davis's Knowledge of His HIV Status*. The State presented evidence showing that on March 18, 2005, Davis was admitted into the hospital from the emergency room after he complained of coughing, shortness of breath, weakness, and unexplained weight loss. The doctor who treated Davis testified that he had a type of

pneumonia associated with the opportunistic infections typically seen in AIDS patients. Davis also suffered from thrush, another opportunistic infection associated with immune-compromised patients.

The doctor explained that the HIV virus destroys the immune system as it grows inside the body by "eat[ing] up . . . CD4 cells." When a person's CD4 cell count is less than 200, a patient is diagnosed with AIDS.[1] A patient with AIDS is also considered HIV positive. At the time of Davis's hospital admission, his CD4 count was 36. The doctor ordered an HIV/EIA[2] screen and a Western Blot test.[3] Both HIV tests were positive, and the doctor diagnosed Davis with "full blown AIDS."

The doctor personally delivered the news to Davis, who did not display the typical reaction to the diagnosis. The doctor explained that "it might have seemed as though he knew or he was aware. I didn't see shock. I didn't see panic or fear. I – just indifference. It's hard to describe." In March 2005, Davis's doctor counseled him multiple times about the transmission of HIV through body fluids, blood, sex, semen,

---

[1] A low CD4 count begins at 699.

[2] This test looks for antibodies fighting the HIV infection.

[3] This test looks for components of the virus such as proteins that make up the virus.

and needles and the importance of limiting partners and practicing safe sex. He had an independent recollection of counseling Davis because they were about the same age and their children had been in a spelling bee together.

Davis's doctor prescribed antiviral medication to stop the growth of the virus and help his CD4 count grow. The doctor testified that the antiviral medication does not cure HIV or AIDS, it treats it. The patient will "always have HIV" as there is no cure. During cross-examination of the defendant's doctors, Davis's counsel established that viruses other than HIV, such as mononucleosis, can establish low CD4 counts, as well as opiate use, malnutrition, over-exercising, and stress.

In October 2009, four years after receiving his diagnosis, Davis was admitted to jail. During processing, Davis told a medical assistant he had "a history of being HIV positive," dating back to 2005. After his arrest on the charges at issues in this case, Davis completed a form on July 27, 2012, notifying the jail that he was "HIV positive and would like a high protein diet." On August 1, 2012, he told a nurse practitioner at the jail that he was HIV positive.

*Similar Transaction in Atlanta*. C. M. testified that she met Davis at church in 2010. Later the same year, they became "romantically involved." In the year 2011 through January 24, 2012, they engaged in unprotected vaginal and oral sex. Later

3

that month, C. M. learned through a routine doctor's appointment that she had tested positive for HIV. Her previous HIV tests in 2004 and 2006 had been negative. When she first confronted Davis about whether he was HIV positive, he denied it and asked her to get a second test. When the second test revealed the same result, Davis told her that he had learned he was HIV positive in July 2011. In her last conversation with Davis, C. M. told him "whatever you do, don't do this to anyone else." After he responded, "girl, whatever," she became concerned. She later viewed Davis's Facebook page and saw "all these different women . . . posting things, and that disturbed me. And I'm . . . he can't do that. He got to be sleeping with them like he did with me and (sic) didn't tell me anything."

On April 18, 2012, she contacted the police[4] about Davis's conduct. On April 26, 2012, a detective interviewed C. M. and obtained Davis's phone number "to get his side also." The detective left a message on this number, and in June 2012, someone who identified himself as Davis called the detective from the number provided by C. M. When the detective explained that she was calling about a report of "ag[gravated] assault" by C. M., Davis interrupted and said, "I never touched [C. M.]. . . . [S]he just mad at me because she contracted HIV from me. That's all. And

---

[4] C. M. contacted the City of Atlanta Police Department.

I got it from another girl." On June 16, 2012, the detective obtained a warrant for Davis's arrest.

*Davis and the Victim in this Case*. In April 2012, the victim and Davis, who knew each other through mutual acquaintances, exchanged phone numbers and began having "flirty and fun" conversations on the telephone. During one of her conversations with Davis, the victim joked about him being "gay" or having "the package,"[5] and Davis "got really upset" and denied it. Before having unprotected oral and vaginal sex with the victim on several occasions in May 2012, Davis never told the victim he was HIV positive.

On May 22, 2012, Davis called the victim and said, "I got a phone call from a girl that [he] was messing with back in . . . October, November. We were having sex unprotected and she told me she tested positive for HIV." When the victim became "frantic," he told her: "[C]alm down. It's not the end of the world. People live with HIV every day. It can go undetected. It's not a death sentence. . . . [C]all your doctor. . . . [I]t's some medicines out there you can take that will prevent you from contacting HIV." He also told her that she should "be fine," because he never ejaculated inside her. Beginning on June 2, 2012, Davis began blocking her calls and texts on his cell

_____

[5] "The package" is slang for HIV or AIDS.

phone. On June 12, 2012, the victim went to the Clayton County Police Department for help because she wanted Davis to get tested.

*Davis's Testimony at Trial*. Davis admitted that he was diagnosed as being HIV positive in March of 2005. He explained that at the time of this diagnosis, he had been "smoking crack cocaine" for about three months and had attributed the symptoms that landed him in the hospital to his drug use. He contended that the first two tests taken in the hospital were "inconclusive" and that a third test performed by a Dr. Shelton came back "HIV positive." He then began taking "HIV medicine." While he accepted the diagnosis at the time, he believed at the time of trial that his HIV status was "in question." He admitted that he was nonetheless continuing to take his HIV medication.

He claimed that he told C. M. he was HIV positive before having sex with her. He testified that while they "started off" using a condom, it eventually "came off." He explained that he mistakenly believed that he could not infect her if he did not ejaculate inside of her, and was surprised when she informed him that she was HIV positive. He admitted during cross-examination that his doctors had informed him to use a condom when having intercourse to protect against infecting another person.

Davis testified that C. M. initially continued their intimate relationship for several months after learning she was HIV positive. When C. M. learned that Davis had informed his wife, from whom he was separated, that C. M. was HIV positive, C. M. became angry, because she viewed resumed communications with his wife as a sign that Davis planned to work on his marriage. When the detective called him about an alleged aggravated assault involving C. M., he told the detective, "I'm HIV positive . . . and she's gotten [it] from me . . . and she's mad because I told my wife . . . I never put my hands on her."

With regard to the victim, Davis denied having "sex of any type" with her. He testified that the victim told him that he "was too large for her" after seeing a photograph of his penis, and they decided before meeting that they would only masturbate in one another's presence. During cross-examination, he clarified that she told him that "she like small penises, that she didn't like large penises." According to Davis, she also described a photograph of his penis as "a Picasa" that she was going to put in a frame. He claimed that his ejaculate never came anywhere near the victim and that there was no need to inform her of his HIV status. He called her a liar for testifying that they had sexual intercourse.

*Defense Experts' Testimony*. Dr. Rodney Richards, who holds a Ph.D. in organic chemistry, testified that the various tests for HIV "are not approved to diagnose actual infectious HIV in someone's blood at any given time." They are not designed to test for the presence of the HIV virus itself. He pointed out that the manufacturers of these tests state that "the significance of the positive Elisa [test] followed by another positive [Elisa] test followed by a Western Blot positive is unknown in persons without symptoms and that clinical correlation as (sic) indicated to see whether a diagnosis of infection is correct." In essence, presumptions about the presence of the HIV virus are made based upon the presence of antibodies that could relate to other antigens or germs. While he has always assumed that the HIV virus is real, the HIV virus has never been cultured or found in a person's blood.

Dr. Nancy Banks, a doctor board-certified in obstetrics and gynecology, testified that Davis's symptoms when he went to the emergency room in 2005 could be attributed to crack cocaine use rather than AIDS as this drug "is very immuno suppressive." She also testified that there is no test on the market that can be used to diagnose HIV because no scientist has been able to culture the virus. Additionally, there are about 70 conditions that can cause a false positive result on tests currently used to identify an HIV infection. In her opinion, the CD4 count parameters

established by the CDC have limited value because "[i]t is uncertain what a normal CD4 count is" and "we don't have a standard at this time."

Dr. David Rasnick, who has a Ph.D. in chemistry, testified that he is the chief science officer at the Office of Medical and Scientific Justice. He stated that smoking crack cocaine is a "documented" cause of thrush, weight loss, and pneumonia, as well as "a strong powerful immune suppressant." Accordingly, it "can cause or manifest symptoms that we think are AIDS leading."

1. Davis asserts that the trial court erred by allowing evidence that he actually infected a similar transaction witness with HIV because the State failed to satisfy the second and third prongs of the test for admission of other acts evidence under OCGA § 24-4-404 (b). In his view, this evidence was irrelevant because "[t]he felony provision of OCGA § 16-5-60 does not require transmission of HIV and in fact criminalizes acts that in the current age of HIV treatment are highly unlikely to pass the virus." We disagree.

> We review a trial court's decision to admit other acts evidence for an abuse of discretion. For trials, like [Davis]'s, that occur after January 1, 2013, the admissibility of other acts evidence is governed by OCGA § 24-4-404 (b) ("Rule 404 (b)"), which provides that "evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may,

9

however, be admissible for other purposes, including, but not limited to, proof of . . . intent . . . ." For other acts evidence to be admissible, the moving party must show that: (1) the evidence is relevant to an issue other than the defendant's character, (2) the probative value is not substantially outweighed by undue prejudice under OCGA § 24-4-403, and (3) there is sufficient proof so that the jury could find that the defendant committed the acts. Rule 404 (b) is a rule of inclusion, but it does prohibit the introduction of other acts evidence when it is offered for the sole purpose of showing a defendant's bad character or propensity to commit a crime.

(Citations and punctuation omitted.) *Booth v. State*, Ga. (3) (Case No. S17A0705, decided August 14, 2017).

While neither this Court nor the Supreme Court of Georgia has previously ruled on the admission of other act evidence in an HIV reckless conduct case, an Indiana court rejected a similar argument in *Johnson v. State*, 785 NE2d 1134, 1139 (I) (B) (Ind. Ct. App. 2003). The defendant in that case asserted "that the trial court abused its discretion in admitting the testimony of Y. V., T. D., and C. B. detailing their prior sexual relationships with [the defendant] and their subsequent positive test results for HIV." Id. The Indiana Court of Appeals was not persuaded by this assertion and concluded:

> Evidence of the HIV status of [the defendant]'s sexual partners as well as his knowledge of their HIV status and his own status was highly probative and relevant as to whether he is HIV-positive and knew that he was positive at the time he engaged in sexual relationships with [the victims]. As [the defendant]'s HIV status and his knowledge of his status were two elements that the State had to establish for a conviction, we find that the probative value of the testimony outweighed any prejudicial effect from its admission.

Id. at 1140 (I) (B). We are persuaded by this reasoning to conclude that the State established the first and second factors for admissibility under Rule 404 (b).

With regard to the third factor, "other acts evidence may be admitted if the court concludes that the evidence is sufficient for the jury to find by a preponderance of the evidence that the other act was committed." *Bradshaw v. State*, 296 Ga. 650, 656 (3), n. 4 (769 SE2d 892) (2015). Based upon C. M.'s testimony about her HIV status before and after she had sexual relations with Davis, as well as medical testimony verifying her negative status, a jury could have found by a preponderance of the evidence that Davis transmitted the HIV virus to C. M. Accordingly, we find no error in the trial court's admission of other act evidence under Rule 404 (b).

2. Davis argues that his counsel's "decision to share [his] defense with an agenda-driven organization, and his failure to vet the group's experts, much less

prevent them from spouting obviously baseless theories, blew [his] credibility in a case where credibility was everything." In Davis's view, counsel's strategic decision to present such experts, who suggested that crack cocaine use caused his HIV symptoms, "'was an unreasonable one no competent attorney would have made under the same circumstances.'"

> In order to succeed on his claim of ineffective assistance, [Davis] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. Id. at 697 (IV).

(Citation and punctuation omitted.) *Baugh v. State*, 293 Ga. 52, 54 (2) (743 SE2d 407) (2013). Satisfying the requirement for deficient performance "requires [a] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Turpin v. Bennett*, 270 Ga. 584, 589 (2) (513 SE2d 478) (1999), citing *Strickland*, supra, 466 U. S. at 687 (III).

> The test for determining whether trial counsel's performance was deficient is whether a reasonable lawyer could have acted, under the same circumstances, as defense counsel acted before and during the trial.

12

> Hindsight is not employed, and our purpose in making this determination is not to grade trial counsel's performance, but simply to ensure that the adversarial process at trial worked adequately. We are therefore highly deferential to the choices made by trial counsel during a trial that are arguably dictated by a reasonable trial strategy.

(Citations and punctuation omitted.) *Head v. Taylor*, 273 Ga. 69, 79 (3) (538 SE2d 416) (2000).

> It is well established that the decision as to which defense witnesses to call is a matter of trial strategy and tactics. In particular, the decision of how to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forego cross-examination and/or to forego development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim.

(Citations and punctuation omitted.) *Humphrey v. Nance*, 293 Ga. 189, 221 (744 SE2d 706) (2013). "The selection of an expert witness is a 'paradigmatic example' of the type of strategic choice that, when made after thorough investigation of the law and facts, is 'virtually unchallengeable.'" *Rockwell v. Davis*, No. 4:14-CV-1055-O, 2016 U. S. Dist. LEXIS 109568 (N.D. Tex. 2016). See also *Adem v. State*, 300 Ga.

13

App. 708, 712 (2) (686 SE2d 339) (2009) (defense counsel afforded wide discretion in decision to call particular expert witness).

During the motion for new trial hearing, Davis's primary trial counsel testified that he had practiced law for 43 years, with 22 years as a prosecutor and the remaining years as a criminal defense attorney. After familiarizing himself with the elements of "a reckless conduct HIV charge," including the element that a person be "HIV positive,"[6] he received information from the Office of Medical and Scientific Justice ("OMSJ") about the nature of HIV tests and the ability of the State to prove this element of the crime. He explained that his client, Davis, made the decision to request help from OMSJ. The OMSJ then provided, free of charge, an attorney familiar with the HIV testing evidence to act as co-counsel[7] and three expert witnesses at trial to support Davis's alternative defense that the State could not prove an essential element of the offense, i. e. that Davis was "an HIV infected person." Davis's primary trial counsel testified that he "took no responsibility for any of the

_____

[6] OCGA § 16-5-60 (c) precludes "an HIV infected person" from knowingly engaging in sexual intercourse or acts without informing the other person of a known HIV infection.

[7] Davis did not present testimony from this attorney during the motion for new trial hearing.

14

HIV material" during the trial. He explained that Davis "requested them" and he "acquiesced." His responsibility during the trial centered around the primary defense that Davis never had sex with the victim. In his view, the two alternative defenses did not interfere with one another; he looked "at the HIV portion of it as icing on the cake." In his view, the HIV experts "weren't so far-fetched[,]" and "one of the substantial things that hurt the defense was Mr. Davis's testimony itself." He explained that "when [Davis] testified his penis was like a Picasso, that was the game . . . in [his] opinion." After Davis's testimony, he was not surprised by the verdict.

Davis testified in the motion for new trial hearing that one of the first people he notified about the charges against him was his doctor, who "had him call HIV law and policy in New York." He explained that his doctor "is one of the leading doctors in America for HIV research. Matter of fact, there is lobbying before [C]ongress for this law to be even taken from off the books." He denied, however, that the OMSJ contacted him about assistance with his case. He also claimed that his doctor warned him against using OMSJ and that he passed this information along to his primary trial counsel.

We agree with the trial court's conclusion that Davis's claim of ineffective assistance has no merit. "[A] strategy that presents alternative defense theories – all

of which are better for the defendant than the prosecution theory of the case – generally falls within the broad range of reasonable professional conduct." (Citation, punctuation and footnote omitted.) *Issa v. State*, 340 Ga. App. 327, 344 (8) (796 SE2d 725) (2017) (rejecting ineffective assistance of counsel claim grounded upon alleged "absurd" defense theory). Based upon the elements of the crime with which Davis was charged and our review of the expert testimony presented on his behalf, we cannot say that the strategy was "so unsound that no reasonable lawyer would have pursued it." (Citations, punctuation and footnote omitted.) Id.

*Judgment affirmed. Dillard, C. J., and Ray, P. J., concur*.