308 Ga. 854
FINAL COPY

S20A0245. THOMPSON v. THE STATE.

BETHEL, Justice.

In December 2016, a Tift County jury found Timmy Leroy Thompson guilty of felony murder in connection with the death of his wife, Peggy Thompson.[1] Thompson appeals, contending that the trial court erred (1) by allowing improper testimony regarding other alleged acts of violence committed by Thompson against his stepdaughter, stepson, and daughter to be admitted at trial, and (2) by not applying the rule of sequestration to these other acts witnesses. For the reasons stated below, we affirm.

1. Viewed in the light most favorable to the jury's verdict, the

---

[1] Peggy died on October 29, 2014. On March 9, 2015, Thompson was indicted by a Tift County grand jury for malice murder, felony murder, and aggravated assault with a blunt object and by strangulation. At a jury trial held on December 6 to 8, 2016, Thompson was found guilty of felony murder, but the jury failed to reach a verdict on either of the remaining counts. Thompson was sentenced to life imprisonment without the possibility of parole.

Thompson filed a motion for new trial on December 29, 2016, and the trial court denied Thompson's motion on May 23, 2019. Thompson then filed a timely notice of appeal, and the case was docketed to this Court's term beginning in December 2019 and submitted for a decision on the briefs.

evidence presented at trial showed that shortly before midnight on October 29, 2014, law enforcement and emergency medical services were dispatched to Thompson's residence in response to a call indicating that Peggy had suffered a possible drug overdose. Law enforcement had responded to at least 20 prior domestic calls at the residence. Police arrived at the scene, and Peggy's body was observed lying on a bed in a back bedroom.

Unsolicited, Thompson told a police officer that he had arrived home around 6:00 p.m. that evening and that Peggy had been feeling unwell. Peggy had been "drinking heavily," and "using marijuana." After the two had sexual intercourse, Thompson put her to bed. Thompson then claimed to have fallen asleep in the living room while watching a movie. When Thompson was startled awake by the movie, he called out to Peggy and when she did not respond he went to the bedroom and found her unresponsive and naked from the waist down. Thompson called 911 and clothed Peggy before the police arrived. While Thompson spoke to the police officer, an EMS technician came out of the house and told Thompson that Peggy was

dead.  Thompson then punched out the glass pane of a nearby door and sustained a deep laceration to his forearm.  The sergeant did not observe any other injuries or bruises on Thompson.

Just after midnight, another police officer arrived on the scene and observed bruising and discoloration on Peggy's face and neck, as well as fluid leaking from an injury on the back of her head.  A GBI crime scene specialist who responded to the scene testified that he observed similar injuries to Peggy's body and a small quantity of marijuana and empty alcohol bottles in the bedroom and that it appeared someone had been sleeping on the couch in the living room.

Thompson was interviewed twice by investigators with the Tift County Sheriff's Office, first in the early morning of October 30, 2014, and second on January 30, 2015, after his arrest.  During the first interview, after being given *Miranda* warnings,[2] Thompson told police that Peggy had not been feeling well and that he called to check on her periodically throughout the day. Thompson told

---

[2] See *Miranda v. Arizona*, 354 U. S. 456 (86 SCt 1602, 16 LE2d 694) (1969).

investigators that after he came home and the pair had sex, Peggy told Thompson that she wanted something to drink.  Thompson and Peggy then drove to a convenience store to buy alcohol, and on the way there Peggy became ill.  After they purchased the alcohol, they returned home to drink and have dinner.  Thompson claimed that Peggy then went to bed around 8:00 p.m. and that he fell asleep on the couch while watching a movie.  When awakened, Thompson called out to Peggy and when she did not respond, he found her unconscious, called 911, and attempted CPR. Thompson told investigators that Peggy had been aggravating him when he came home from work, but he denied ever hitting, strangling, or arguing with her that day or at any point in their relationship.[3] When asked about Peggy's injuries, Thompson told investigators that the bruises on her face had been there for two days and that Peggy commonly fell down and hurt herself when drunk.

After an autopsy, Peggy's cause of death was determined to be

---

[3] Thompson told investigators that he had held Peggy down before to prevent her from assaulting him, but otherwise "he had never laid a hand on her."

blunt-force injuries to her head in conjunction with asphyxia, and her death was ruled a homicide. She had injuries to her head, face, scalp, neck, upper chest area, and arms consistent with blunt-force trauma and strangulation, but not consistent with a fall. Peggy's injuries were determined to have been caused between one and four hours before her death. Oral and rectal swabs collected from Peggy at the scene tested positive for male DNA matching Thompson.

At trial, Peggy's niece testified that, several times in the year before she died, Peggy had stayed with her to "get away" from Thompson. During the last time Peggy stayed with her niece in June 2014, Peggy was sitting on the front porch when she heard Thompson's motorcycle coming down the road. Peggy jumped up screaming, "He's coming, he's coming," before running back into the house, out of the back door, and into the woods. Thompson yelled so loudly for his wife to come out that neighbors called the police, who then arrived and told Thompson to leave. Peggy remained with her niece for four days before returning to Thompson. Peggy's two children and stepdaughter testified about the abusive treatment

they had each suffered from Thompson, and the similar treatment they had seen Peggy suffer.[4]

Peggy's adult daughter testified that she lived at Thompson's and Peggy's home until she was about 14 years old. During that time, Thompson strangled the daughter on multiple occasions and often beat her with a belt buckle and left bruises. She also testified that Thompson had pushed her out of a moving car, causing a serious laceration that needed stitches, had twisted her arm so far that it broke, and had used an extension cord to hit her. She further testified that living in the house felt like "hell," and that Thompson would frequently hit and strangle Peggy and had once tackled Peggy to the floor and pushed her through a glass window. Peggy would fight back sometimes, and other times the children would plead with Thompson to stop hitting and strangling Peggy.

Peggy's adult son also testified about incidents of violence he had experienced while living in Thompson and Peggy's home during

---

[4] These witnesses were Thompson's stepchildren by marriage to Peggy and his biological daughter. The trial court admitted their testimony under OCGA § 24-4-404 (b).

his "younger life." He testified that Thompson had a bad temper and would hit him with a paddle board or belt weekly, would strangle him on occasion, and strangled him to win physical fights. Peggy's son further testified that Thompson and Peggy would hold his head down on a pillow until he could no longer breathe. Peggy's son also testified that when Peggy would fight Thompson back, he would strangle her to gain control. Peggy's son once observed Thompson attack and strangle Peggy's father after he told Thompson to stop fighting with Peggy.

Thompson's adult daughter, who moved in with Thompson when she was in fifth grade, testified that Thompson did not hurt her for the first year she lived with him, but after that it became "chaos" as Thompson began to hit her with his hands or a belt, often leaving bruises. Once, Thompson took her to the bedroom and punched her in the face, knocking her onto the bed. Thompson's daughter testified that Peggy and Thompson would physically fight, and that in one of those fights, Thompson slammed Peggy to the ground in the front yard and strangled her. On another occasion, she

witnessed Thompson push Peggy down onto a couch and strangle her until she was almost blue. Thompson's daughter also testified that Peggy rarely drank, but that Thompson drank frequently, and the more Thompson drank, the angrier he became.

Although Thompson has not challenged the sufficiency of the evidence presented against him at trial, it is our customary practice to review the sufficiency of the evidence in murder cases, and we have done so here. After reviewing the record of Thompson's trial, we conclude that the evidence presented against him was sufficient to authorize a rational jury to find beyond a reasonable doubt that Thompson was guilty of felony murder. See *Jackson v. Virginia*, 443 U. S. 307, 318-319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Thompson argues that the trial court erred in admitting the other acts testimony of his stepchildren and daughter under OCGA

§ 24-4-404 (b) because the evidence was irrelevant to anything other than Thompson's character. We disagree.

OCGA § 24-4-404 (b) ("Rule 404 (b)") states in pertinent part:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

A trial court's decision to admit other acts evidence is reviewed for abuse of discretion. *Booth v. State*, 301 Ga. 678, 682 (3) (804 SE2d 104) (2017). This Court has adopted a three-part test to determine the admissibility of other crimes and acts under Rule 404 (b):

> (1) the evidence must be relevant to an issue other than defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; (3) the government must offer sufficient proof so that the jury could find that defendant committed the act.

(Citation and punctuation omitted.) *Bradshaw v. State*, 296 Ga. 650, 656 (3) (769 SE2d 892) (2015).

Here, the State provided timely notice of its intent to admit testimony of Thompson's stepchildren and daughter concerning

other acts under OCGA § 24-4-404 (b). The trial court admitted the evidence as relevant to issues other than Thompson's character, namely, to show "intent, plan, knowledge, absence of mistake or accidents, and to corroborate the statements of the witnesses and [Thompson] relative to the crimes alleged." The trial court provided a limiting instruction during the final charge to the jury which instructed the jury that it could consider the evidence only for the purposes for which it was admitted.

Thompson argues that there was no permissible purpose for the evidence and that its admission was error. We disagree. Thompson's intent to commit aggravated assault against Peggy, the predicate felony for felony murder, was an issue at trial because he told police that he had never harmed his wife, he suggested that her injuries resulted from accidental falls, he pled not guilty, and he did not affirmatively remove the issue of intent. See *Jackson v. State*, 306 Ga. 69, 77 (2) (b) (i) (829 SE2d 142) (2019). Further, the intent required for the charged offense of aggravated assault and the other acts is the same, thus satisfying the first prong of the Rule 404 (b)

test. See *Booth*, 301 Ga. at 683 (3). Thompson was charged with aggravated assault for assaulting Peggy with an unknown blunt object, resulting in serious bodily injury, and with an unknown item, resulting in strangulation. The other acts testimony demonstrates Thompson's same intent to commit aggravated assault against his wife and other family members and undermines his claim of accident.[5] See id. at 685 (3) (that the defendant intentionally hit another intimate partner in the head was relevant to show that he committed a similar act of assault on his intimate partner victim with the same sort of intent). Therefore, the trial court did not err in ruling the testimony of these witnesses to be relevant to matters other than his character.[6]

---

[5] Although this kind of other acts evidence has been used to show motive in other cases, here, the trial court did not admit the other acts evidence for that purpose. See, e.g., *Smart v. State*, 299 Ga. 414, 417 (2) (788 SE2d 442) (2016) (affirming trial court's finding that defendant's prior domestic violence against an ex-wife was relevant to the severe beating and strangulation death of his current wife because it demonstrated "defendant's motive to control family members with violence and his intent to harm his intimate partners").

[6] Because the Rule 404 (b) evidence was relevant to prove intent and absence of mistake or accident, we need not decide whether it was also relevant for other purposes, as the trial court found. See *Naples v. State*, 308 Ga. 43, 52 n.9 (838 SE2d 780) (2020). In addition, Thompson's claim of error is to the

As to the second prong of the Rule 404 (b) test, the trial court did not abuse its discretion when it determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. See OCGA § 24-4-403. In weighing the probative value of other acts evidence, a court may consider a number of factors, including (1) prosecutorial need, (2) overall similarity of the other acts and the acts charged, and (3) the temporal remoteness of the other acts. *Bradshaw*, 296 Ga. at 657-658 (3).

Here, the State had a strong need for this evidence. There were no eyewitnesses to Peggy's death or the events immediately leading up to it. Thompson claimed that Peggy's bruising had been sustained in a drunken fall and further claimed he had never hurt Peggy, thus providing evidence that he did not intend to harm or kill her. Thompson also called 911 and reported to law enforcement and emergency personnel that he suspected Peggy had suffered some

admission of the other acts evidence at all, and not also to the scope of purposes for which the trial court told the jury it could consider the evidence in its limiting instruction.

type of overdose. To satisfy its burden of proof and to specifically rebut Thompson's explanation as to how Peggy was injured and how she died, the State needed evidence that Peggy's death was not an accident or mistake and that Thompson acted with the intent to commit those crimes.  See *Castillo-Velasquez v. State*, 305 Ga. 644, 649 (2) (827 SE2d 257) (2019) (prosecutorial need was high where defendant provided evidence tending to negate criminal intent). There was also significant similarity between the other acts evidence, which showed that Thompson had a long history of strangling and beating his wife and children, and the aggravated assault against Peggy, which involved her strangulation and beating with a blunt object. Although the record is not clear as to the timing of the other acts, they were "not so remote as to be lacking in evidentiary value," particularly as the physical abuse continued throughout the periods they lived with Thompson rather than being isolated events. (Citation and punctuation omitted.) Id. (noting nine years between other acts and crime). The other acts evidence therefore had substantial probative value.

The other acts evidence had a prejudicial effect, but no more than was inherent in the prior acts; the evidence was not "dragged in by its heels for the sake of its prejudicial effect." *Olds v. State*, 299 Ga. 65, 70 (2) n.7 (786 SE2d 633) (2016) ("The major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (citation and punctuation omitted)). See also *Worthen v. State*, 306 Ga. 600, 606 (2) (832 SE2d 335) (2019) ("(I)n a criminal trial, inculpatory evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that [Rule 403] permits exclusion." (citation and punctuation omitted)). Moreover, in its final charge to the jury, the trial court gave the jury specific instructions about the limited purpose of the other acts evidence, and the jury is presumed to follow the trial court's instructions. See *Howell v. State*, 307 Ga. 865, 875 (3) (838 SE2d 839) (2020). For these reasons, we cannot say that the trial court abused its discretion by determining that the probative value of the other acts evidence was not substantially outweighed by undue prejudice to

Thompson. See *Olds*, 299 Ga. at 70 (2) ("[T]he exclusion of evidence under [that rule] is an extraordinary remedy which should be used only sparingly." (citation and punctuation omitted)).

The third prong of the Rule 404 (b) test is also satisfied here because the jury could have found by a preponderance of the evidence that Thompson committed these other acts. Thompson's stepchildren and daughter testified about acts of violence committed against them or those against their mother that they witnessed firsthand. See *Smart*, 299 Ga. at 419 (2) (c) (eyewitness testimony by family member was sufficient proof that defendant committed extrinsic acts under Rule 404 (b)). Thompson has therefore failed to show that the trial court abused its discretion in admitting the evidence under the three-prong test. Accordingly, there is no error.

3. Thompson also argues that the trial court erred by not applying the rule of sequestration to his stepchildren and daughter. We disagree.

Prior to the jury being impaneled and sworn, Thompson invoked the rule of sequestration as to the other acts witnesses. See

OCGA § 24-6-615 ("Except as otherwise provided in Code Section 24-6-616, at the request of a party the court shall order witnesses excluded so that each witness cannot hear the testimony of other witnesses, and it may make the order on its own motion."). The State requested that Peggy's children and stepdaughter be excused from the rule under the Crime Victims' Bill of Rights, in particular OCGA § 17-17-9, as they were qualifying members of the victim's family under the statute. Thompson objected, but the trial court excused these witnesses from sequestration based on OCGA § 17-17-9. All three children were permitted to watch the entirety of the trial, including each other's testimony, and testified tenth, eleventh, and twelfth, respectively out of fifteen State witnesses. After their testimony, Thompson renewed his objections to the Rule 404 (b) evidence and the exclusion of these witnesses from sequestration.

A trial court's decision to grant an exception to the rule of sequestration is within the court's discretion. See *Moore v. State*, 297 Ga. 773, 774 (2) (778 SE2d 210) (2015). OCGA § 24-6-616 carves out an exception to the general rule of sequestration and provides that

"the victim of a criminal offense shall be entitled to be present in any court exercising jurisdiction over such offense." OCGA § 24-6-616's exception to the rule of sequestration is subject to OCGA § 17-17-9, which provides in pertinent part:

> A victim or member of the immediate family of a victim shall not be excluded from . . . trial . . . based solely on the fact that such person is subpoenaed to testify unless [(1)] it is established that such victim or family member is a material and necessary witness . . . and [(2)] the court finds that there is a substantial probability that such person's presence would impair the conduct of a fair trial. . . . A motion to exclude a victim or family members from the courtroom for any reason other than misconduct shall be made and determined prior to jeopardy attaching.

Since its enactment, Georgia courts have applied OCGA § 17-17-9 to allow the trial court to except both testifying victims and members of the victim's immediate family from the rule of sequestration. See *Nicely v. State*, 291 Ga. 788, 795 (2) (733 SE2d 715) (2012) (discussing the exclusion of victim's mother from sequestration). See also *Percell v. State*, 346 Ga. App. 219, 222 (3) (816 SE2d 344) (2018) (excluding a victim from the rule of sequestration); *Freeman v. State*, 333 Ga. App. 6, 12 (2) (775 SE2d

258) (2015) (excluding a victim from the rule of sequestration). As required by the statute, Thompson's motion to sequester these witnesses from the courtroom was made and ruled upon prior to jeopardy attaching.[7] Before the jury was impaneled and sworn, the State asked that the witnesses be excluded from sequestration because they were Peggy's children. The trial court exempted the children from the rule of sequestration.

Here, OCGA § 17-17-9 gave the trial court discretion to allow Peggy's adult children to remain in the courtroom, as her children are both "victims" and "immediate family members" under the language of the statute. Under OCGA § 17-17-3 (11) (B), when a crime victim is deceased, "victim" is defined to include "[a]n adult child" if the crime victim's spouse is either in custody for an offense or the defendant. And while OCGA § 17-17-9 does not explicitly define who constitutes an "immediate family member" under the statute, the phrase is commonly understood to include a person's

---

[7] Jeopardy attaches in a jury trial when a "jury is impaneled and sworn." *Alexander v. State*, 279 Ga. 683, 685 (2) (b) (620 SE2d 792) (2005).

children and stepchildren. See Black's Law Dictionary (11th ed. 2019) (defining "immediate family" as "1. A person's parents, spouse, children, and siblings. 2. A person's parents, spouse, children, and siblings, as well as those of the person's spouse. Stepchildren and adopted children are usu[ally] immediate family members."). Thus, in cases such as this where the crime victim is deceased, the terms "victim" and "immediate family member" may apply to the same individuals. Here, the witnesses at issue are the children, two biological and one by marriage, of the deceased crime victim and thus fall within the plain meaning of both exceptions created by the statute. Therefore, the trial court could properly except these witnesses from the rule of sequestration as either victims or as immediate family members of a victim under the Crime Victims' Bill of Rights.

At trial, Thompson did not ask for findings from the trial court that, under OCGA § 17-17-9, Peggy's children and stepchild were material and necessary witnesses, or that their presence would impair the conduct of a fair trial, such that the rule of sequestration

should still apply to these witnesses. Even assuming the witnesses were material and necessary, there is no indication that their presence would impair the conduct of a fair trial. None of the children witnessed Peggy's death, and each witness's testimony involved different instances of abuse that, although similar, did not mirror each other or indicate any evidence of fabrication or collusion. Finally, there were no other witnesses who testified at trial concerning these other acts. See *Davis v. State*, 299 Ga. 180, 185 (2) (a) (2) (787 SE2d 221) (2016) ("[T]he purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion." (citation and punctuation omitted)).

Therefore, the court did not abuse its discretion by not applying the rule of sequestration as to these witnesses. Accordingly, there is no error.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 1, 2020.
Murder. Tift Superior Court. Before Judge Cross.
*Lon P. Kemeness*, for appellant.
*C. Paul Bowden, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.