NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 21, 2023

S23A0200. GREENE v. THE STATE.

LaGrua, Justice.

Appellant Eric Jackson Greene was convicted of malice murder and theft by taking in connection with the strangling death of Sheila Bryant in January 2019.[1] On appeal, Greene contends that the evidence was legally insufficient to support his convictions and that the trial court erred in the following respects: (1) by denying

---

[1] Bryant's body was discovered on January 25, 2019. In March 2019, Greene was indicted by a Douglas County grand jury on charges of malice murder, felony murder predicated on aggravated assault by strangling her, and theft by taking. In February 2020, a jury found Greene guilty of all counts. The trial court sentenced Greene to serve life in prison without the possibility of parole on the malice murder count, plus an additional ten years on the theft by taking count. The felony murder count was vacated by operation of law. On March 3, 2020, Greene filed a timely motion for new trial, which he amended through new counsel on January 4, 2021. Following an evidentiary hearing, the trial court denied Greene's motion for new trial on July 29, 2022. Greene filed a timely notice of appeal to this Court on August 11, 2022, and the case was docketed to the term of this Court beginning in December 2022 and submitted for a decision on the briefs.

Greene's motion to suppress his statement taken on February 18, 2019; (2) by admitting improper extrinsic evidence; (3) by admitting overly graphic autopsy photographs; (4) by allowing the State to present harmful and non-probative evidence from Greene's cell phone showing that he conducted internet searches pertaining to rape; and (5) by failing to instruct the jury on mere presence and corroboration of a defendant's statement. For the reasons that follow, these claims fail, and we affirm Greene's convictions.

The evidence presented at Greene's trial showed that, on the night of January 23, 2019, Greene—who did not have a permanent residence—stayed at the home of Kenny Bradford.[2] Christina Norton was also staying at Bradford's house in January 2019, and she testified that, on January 24, she needed a ride to meet with her probation officer, so she texted her friend, Blake Lee, to ask for a ride. Lee did not have a car of his own, but he was living with Bryant—the victim in this case—who did own a car. Lee testified

---

[2] Bradford testified that a lot of people were "coming and going" and "doing drugs" at his house during this time period.

2

that he asked Bryant if they could give Norton a ride to her probation meeting in Bryant's car, and Bryant agreed. Lee and Bryant arrived at Bradford's house around 3:30 p.m. on January 24. According to Norton, Greene had been hanging out at Bradford's house all day, trying to get a ride to a car lot because he wanted to steal a truck. And, when Lee and Bryant arrived and Greene realized that Bryant owned a car, he asked for Bryant's help to "accomplish this car lot plan" because Greene "needed somebody to be there to test drive [the truck]." Lee testified that he and Bryant did not know Greene, so Lee told Greene they could not help him with his plan. Lee later realized that Greene had talked Bryant into taking him to the car lot because, when they left Bradford's house, Greene rode with them.

Lee testified that, after leaving Bradford's house, he asked Bryant to drop him off at a mobile home park where Zada Price—a woman he knew—lived. According to Lee, after getting dropped off, he could not get in touch with Price, so he went to the home of her neighbor, Greg Jones. Jones testified that Lee ended up staying at

3

his house for "five or six, seven hours," until after 9:30 p.m., trying to reach Price and waiting for Bryant to pick him up. After several hours, Lee assumed that Bryant was not going to "show back up," so he walked back to Bradford's house. Greene and Bryant did not return to Bradford's house that night, and Lee testified that he never saw Bryant again.

At approximately 7:45 the next morning, Bill Messer was driving home from work along West Union Hill Road when he saw "somebody l[y]ing on the side of the road." Messer pulled over and approached the person, noting upon closer examination that it was a woman, lying "face down," whose "underwear was still for the most part up, but her pants were pulled down." Messer, who was a firefighter, "took a radial pulse from both [her] wrists," and after finding no pulse, he called 911.

Law enforcement officers with the Douglas County Sheriff's Office arrived shortly afterwards and also observed a "female l[y]ing face down on the side of the road," with her arms "stretched above her head," her pants and underwear "pulled down below her

4

buttocks," and her "feet elevated in some bushes." Lieutenant Greg Ashcraft, one of the responding officers, testified that the woman also had frost on her jacket, "which told [him] she had been out there a period of time and the moisture had frozen on her." Lieutenant Ashcraft also noticed tire impressions going through the grass close to the body. When officers turned the woman's body over in preparation for removing her from the scene, Lieutenant Ashcraft observed that "a lot of her abdomen area [was] exposed" and that she had "bruising" up towards her "ear area" and "what appeared to be an injury around the neck area," including "sign[s] of a ligature having been used." Lieutenant Ashcraft testified that, on this basis, he believed this woman had died from "ligature strangulation."

Investigator Jay Hayes with the Criminal Investigation Division of the Douglas County Sheriff's Office also responded to the scene and used a mobile fingerprint identification device to identify the deceased as Bryant. At trial, the medical examiner testified that Bryant's cause of death was ligature strangulation by a belt or similar object, as demonstrated by "the broad abrasion over a

significant portion of the neck" and a "very straight line across the whole front of the neck." According to the medical examiner, the strangulation was "forceful," causing "deep tissue damage." The medical examiner also noted bruising on Bryant's extremities, as well as "contusions and superficial abrasions and skin tears on her hands," indicating that she was "in a struggle" and "trying to fight somebody off." The medical examiner also documented "injuries to [] Bryant's vagina" consistent with "sexual penetration."

Investigator Hayes testified at trial that Lee was initially a person of interest because he lived with Bryant and was the last person Bryant's daughters had seen with her on January 24. On January 29, 2019, Investigator Hayes interviewed Lee at the Sheriff's Office. During the interview, Lee told Investigator Hayes that Bryant and Greene dropped Lee off at a mobile home park on the afternoon of January 24 and that was the last time he saw Bryant. Lee stated that he hung out at Jones's house because he could not get in touch with Price—the woman he was hoping to see—

and after several hours, Lee walked back to Bradford's house.[3] Based on Lee's cell phone records and witness interviews, Investigator Hayes "eliminate[d]" Lee as a suspect, determining that Lee "wasn't anywhere near" the "area of the crime scene" during the hours in question. Investigator Hayes also learned that Bryant owned a four-door, silver or gray 2010 Mazda 6 sedan that was missing.

During the early morning hours of January 30 or 31, Lee called Investigator Hayes and informed him that Greene had just stopped by Bradford's house and was driving Bryant's car. Norton testified that she also saw Greene in Bryant's car that night, and then, on February 1, she received a text message from Greene at 4:15 a.m., stating that it was "hard to believe [Bryant] got killed." Norton also received a second message from Greene stating that Bryant had told Greene on January 24 that "she was supposed to go meet someone about some pills."

---

[3] During this interview, Lee consented to having a buccal swab of his DNA taken by Investigator Hayes.

7

About a week later, on February 7, Officer Timothy Ito with the Paulding County Sheriff's Office responded to "a report of a vehicle parked in front of a residence" in Paulding County "where the male was sleeping in the front seat." When Officer Ito arrived, he observed a man asleep in the front seat of a "gray four door Mazda" sedan. Officer Ito directed the man—later identified as Greene—to exit the vehicle. As Officer Ito was in the process of obtaining Greene's personal information, he received a report that "the vehicle had returned as stolen" and "was connected to a homicide." At that point, "Greene grabbed his phone and took off running," but he tripped and fell down. Officer Ito took Greene into custody and coordinated with Douglas County law enforcement to tow Bryant's vehicle and have Green transported to Douglas County.

Later that same day, Investigator Hayes interviewed Greene.[4] After waiving his *Miranda* rights,[5] Greene told Investigator Hayes

---

[4] This interview was video-recorded and played for the jury at trial.
[5] *Miranda v. Arizona,* 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

that he had borrowed the car he was sleeping in "from a guy named Blake"—later determined to be Blake Lee—about two weeks before. Greene told Investigator Hayes that he met Lee on January 24 when Lee "showed up" at Bradford's house with "an older lady"—later determined to be Bryant—and they gave Greene a ride to a few car lots in Villa Rica and Douglasville for Greene to look for a truck. Greene said that, when they arrived at the last car lot in Douglasville, he "got out of [the car] and they took off on [him]." Greene said his phone was not working, so he had to walk back to Bradford's house. Greene stated that he saw Lee again about "two or three days" later at Bradford's house, and Greene borrowed the car from Lee.

Investigator Hayes confronted Greene with Lee's account of events and advised Greene that Bryant had been murdered. Greene said he did not realize Bryant was dead, denied any involvement in her death, and consented to have a buccal swab of his DNA taken. Greene also gave several differing accounts about how he obtained Bryant's car. In the last account, Greene said that, three days after

9

he visited the car lots with Lee and Bryant, Lee offered to rent him Bryant's car, and Greene agreed to do so.

When Investigator Hayes informed Greene that he would "pull video" surveillance from the various car lots Greene had mentioned, Greene's account changed slightly. Greene said he went to one car lot alone with Bryant because they had dropped Lee off at a store. According to Greene, when they arrived at this car lot, Bryant appeared to be under the influence. Greene said he did not want her driving "when [she] was like that," so he helped her out of the car and put her in the passenger seat. Greene said he then drove Bryant's car to pick up Lee, and they stopped by a few other car lots. At the last one, Lee and Bryant left Greene, forcing him to walk back to Bradford's house.

At the end of the interview, Investigator Hayes looked through Greene's cell phone and observed that the call log started at 6:35 p.m. on January 25, the day Bryant's body was discovered. Greene told Investigator Hayes that he did a factory reset on January 25 because the "memory got too full" and the phone was "not working."

10

Investigator Hayes also observed "slight indications of healing from scratch marks or like thin lacerations on [Greene's] hands." When Investigator Hayes asked Greene about the scratches and whether his DNA would be under Bryant's fingernails, Greene insisted that he did not touch Bryant and that he would "never do anything to harm a woman."

Following this interview and after obtaining a search warrant for the contents of Greene's cell phone, an investigator conducted a search of the phone and discovered that, on January 23 and 24, 2019, Greene conducted internet searches, specifically appearing on his phone as "'Rape' Search – [a link to the specific website]." Any material or photographs Greene might have obtained as a result of these searches were not referenced or admitted at trial—only the fact that Greene conducted the searches. Additionally, Investigator Hayes obtained surveillance video from the car lots Greene mentioned and from the surrounding businesses, but the footage did not show that Greene visited or was in the vicinity of any of those businesses on January 24, except for Comfort Cars in Villa Rica.

The surveillance video recording from Comfort Cars and the testimony from one of its salesman, James Clayton, demonstrated that Bryant and Greene arrived at the car lot in Bryant's car around 5:00 p.m. on January 24. Bryant was driving the car at the time, Greene was in the front passenger seat, and no one else was in the car. Clayton testified that these two individuals "stuck out in [his] mind" because the "female in the vehicle was high on something" and "couldn't even hold herself up." Clayton observed that "she was slumped over" in the car and "kind of drunk like." Greene told Clayton that he was looking for a truck and asked about a Chevrolet Avalanche that Clayton had on the lot. Greene told Clayton that "he didn't have a license, so she [indicating Bryant] was going to drive," and Clayton responded that she was "not in any shape to drive." Clayton testified that he walked over to the office to get the key to the Avalanche, and as he did so, he could hear Greene telling Bryant to "straighten the f**k up" and "sit up straight." Clayton said he heard Greene yelling and swearing at her, calling her a "stupid f**king b**ch." According to Clayton, Greene then pulled Bryant

12

out of the driver's seat of the car and walked her around to the front passenger seat. Clayton said "she was a dish rag," that "she was gone." Greene got into the driver's seat of Bryant's car and drove out of the Comfort Cars lot at 5:25 p.m.

Officers collecting evidence from Bryant's car located a receipt from an auto parts store with Greene's name and contact information on it. The manager of the auto parts store testified that, on January 25, at 7:27 p.m., he assisted Greene in exchanging a headlight bulb that Greene had purchased earlier in the evening for one that would fit a 2010 Mazda 6.

A forensic DNA analyst with the GBI testified that she tested swabs from Bryant's hands and vaginal area and identified Greene's DNA on Bryant's fingernail clippings and inside her vaginal area. Greene was arrested soon afterwards.

On February 15, Investigator Hayes interviewed Greene a second time[6] and reviewed Greene's *Miranda* rights, which Greene agreed to waive. After Investigator Hayes confronted Greene with

---

[6] This interview was video-recorded and played for the jury at trial.

discrepancies in his statements from the February 7 interview—including where Greene allegedly went on January 24 and 25, who accompanied him, and when he took possession of Bryant's vehicle—Greene eventually told Investigator Hayes that, about 45 minutes after being left at the last car lot on January 24, Lee and Bryant returned, and the following occurred:

> [Lee] comes to me. He was in the driver's seat, she was in the passenger's seat. And I thought she was asleep. And he sat there and said, "Hey, I done f\*\*ked up. I done f\*\*ked up." And I was like, "How'd you f\*\*k up?" And he said [inaudible], "I don't know what to do, I don't know what to do." And I said, "So what are you talking about? What did you do?" And he said, "I killed somebody." And I said, "How'd you kill somebody?" And he said, "She's dead." And I said, "Who's dead?" I didn't know he was talking about the woman who was sitting right next to him.

Greene said he asked Lee to drop him off because he "didn't want any part of it," and Greene hitched a ride back to Bradford's house to get his belongings and then to a friend's house in Paulding County. Greene told Investigator Hayes that the next day, January 25—around 1:00 or 2:00 p.m.—Greene was walking down the road in Villa Rica when he "ran into [Lee] again." According to Greene,

14

Lee was driving Bryant's Mazda, and Lee stopped the car and told Greene that he would sell him the car and "give him the title and everything." Greene said he agreed to buy the car and took possession of it at that time. Greene told Investigator Hayes that he replaced the headlight that evening because he noticed "it was blown."

The trial evidence showed that Greene ultimately gave five accounts of what occurred on January 24 and 25. In Greene's final account, Greene told Captain John Sweat—who had taken over the interview for Investigator Hayes—that, 45 minutes after Lee and Bryant left Greene at the last car lot, they returned with "two unidentified males in the back seat of the car," and Greene sat in between the men in the back seat. Greene indicated that these men were "[u]nknown gang members," but could not otherwise provide any identifying information about them or how to get in touch with them. Greene said that Bryant was alive at this point, and she and Lee were "bickering." According to Greene, a few minutes later, they pulled off the road near some power lines on West Union Hill Road

15

in Douglas County, and Lee choked Bryant with his arm and wrapped "a purple scarf around her neck," which he used to strangle her.[7] Greene then demonstrated the act for Captain Sweat, explaining that Lee pulled the scarf through the headrest and "cinche[d] down on it." Greene stated that he tried to stop Lee, but he "had these two guys sitting beside [him], and each one put a gun to [his] head at that moment." Greene said that, after Bryant was "obviously dead," Lee drove over to the "dump site"—an area off the side of the road, not far from the area where she was killed. Greene said that Lee and one of the men pulled Bryant out of the car and "dragged her over to the wood line off the roadway," leaving her face down on the side of the road. Greene said the man seated beside him in the backseat put a gun in his mouth and "told [him] not to move." Greene stated that Lee and "this other guy" went through Bryant's pockets and stole something from her. Greene repeated the

---

[7] The medical examiner testified that, "based on the broad abrasion over a significant portion of the neck" and a "very straight line across the whole front of the neck," it "d[id]n't seem likely" that Bryant was strangled with a scarf.

16

same account to Investigator Hayes when Hayes rejoined the interview. Investigator Hayes asked Greene if he would be able to lead officers to the site where Bryant was killed, and Greene indicated he could do so.

On February 18, Investigator Hayes and another officer picked Greene up at the Douglas County Jail.[8] Investigator Hayes testified that he briefly reviewed Greene's *Miranda* rights again, after which Greene led the officers to "a dirt, turn-off road with power lines running across it" along West Union Hill Road, where Greene asserted that Bryant had been killed. Investigator Hayes testified that this location was "[a]bout six-tenths of a mile" from there they found Bryant's body.

At trial, Jerry Trotter, a family friend of Greene's, testified that, between 9:45 and 10:15 p.m. on January 24, Greene stopped by Trotter's house, which is located "maybe a mile" from where "[Bryant's] body was found." According to Trotter, Greene was alone at the time and was driving "a late model dark colored four-door

---

[8] This car trip was audio-recorded and played for the jury at trial.

sedan" that Trotter had never seen before. Trotter asked Greene whose car he was driving, and Greene said it was "his girlfriend's, Sheila's." When the State asked Trotter about Greene's demeanor that night, he testified that Greene seemed "nervous" and "worried." Additionally, Trotter testified that he was very familiar with the area where Bryant was purportedly killed—i.e., the power lines on West Union Hill Road—because he and Greene fished a pond in that area and Greene would also occasionally hang out and sleep in his car there. Amber Echols, an acquaintance of Greene's, also testified at trial that she and Greene had previously hung out by the power lines on West Union Hill Road to "smoke[]" because the area was "off the road" where "nobody could see [them]." Echols said that, in late January 2019, Greene started driving a "darker color" car with four doors.

Jennifer Brownlow, a family friend of Greene's, also testified at trial. According to Brownlow, Greene attended a birthday party at her house on January 27, 2019, arriving in a "blue colored car" with "four door[s]." Brownlow observed that Greene was "a little off

18

that day, kind of fidgety, looking around," and stayed at the party for "maybe ten minutes at the most."

1. On appeal, Greene contends that the evidence was insufficient to support his conviction for malice murder under OCGA § 16-5-1 (a).[9] See *Jackson v. Virginia,* 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Greene also contends that his conviction was based solely on circumstantial evidence and that the State failed to exclude the reasonable hypothesis that Lee was the person who killed Bryant by strangling her. See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). Pretermitting whether Greene's convictions were based solely on circumstantial evidence, we disagree that the evidence was insufficient to support Greene's conviction for malice murder as a matter of constitutional due process or under OCGA § 24-14-6.

---

[9] Pursuant to OCGA § 16-5-1 (a), "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being."

19

When evaluating challenges to the sufficiency of the evidence as a matter of constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (III) (B) (emphasis in original). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, and we do not reweigh the evidence." *Harris v. State*, 313 Ga. 225, 229 (2) (869 SE2d 461) (2022). Additionally,

> "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable. Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law.

*Garay v. State*, 314 Ga. 16, 19-20 (2) (875 SE2d 631) (2022) (quoting OCGA § 24-14-6). And, although "the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." Id. at 21 (2) (citation and punctuation omitted).

Construing the evidence in the light most favorable to the jury's verdict, the evidence demonstrated the following: (1) Greene was the last person seen with Bryant on January 24, 2019—the day before her body was discovered; (2) the sales manager for Comfort Cars observed Greene yelling and swearing at Bryant in the Comfort Cars parking lot that evening, and around 5:25 p.m., Greene moved Bryant to the passenger seat and drove her car away from the dealership; (3) later that night, between 9:45 and 10:15 p.m., Greene showed up at Trotter's house alone, driving a vehicle closely resembling Bryant's car that he said had been given to him by someone named "Sheila"; (4) the next morning, Bryant was found dead on the side of the road—in an area close to where Trotter lived—with her pants and underwear pulled down, and Greene's

21

DNA was found inside Bryant's vaginal area; (5) Greene purchased a headlight bulb for Bryant's car the evening after her body was discovered; (6) over the next few days, several witnesses, including Lee, saw Greene driving Bryant's car; (7) a week or so later, Greene was discovered by law enforcement sleeping in and living out of Bryant's car; (8) during Greene's subsequent interviews with law enforcement, Greene gave a number of conflicting accounts regarding his whereabouts and activities on January 24 and 25, and those interviews were played for the jury; (9) Greene's DNA was found underneath Bryant's fingernails, and Investigator Hayes observed scratch marks on Greene's hands during his first interview on February 7; and (10) the medical examiner testified that Bryant had "superficial abrasions and skin tears on her hands"—consistent with having been "in a struggle" and "trying to fight somebody off." Additionally, Greene placed himself at the location of Bryant's murder and the location where her body was found—stating that he was present for Bryant's murder and the disposal of her body, but did not kill her or touch her. Greene also led Investigator Hayes to

the murder site—the power lines along West Union Hill Road—and trial testimony from Trotter and Echols demonstrated that Greene was familiar with this area, having gone there often to fish, hang out, sleep in his car, and smoke. And, although Greene told Investigator Hayes that he saw Lee strangle and kill Bryant, law enforcement had already eliminated Lee as a suspect based on witness statements and cell phone data that confirmed Lee was nowhere near the crime scene on January 24 and 25.

The jury was "entitled to disbelieve" Greene's version of the events preceding Bryant's death because "his story conflicted with most of the other evidence." *McKinney v. State*, 300 Ga. 562, 567 (2) (797 SE2d 484) (2017). "The jury could instead believe the testimony and other evidence" indicating that Greene was the person who strangled Bryant to death on the night of January 24. Id.

Accordingly, after properly viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was sufficient under the *Jackson* standard for a jury to find Greene guilty beyond a reasonable doubt of malice murder. See *Jackson*,

443 U.S. at 319 (III) (B). See also *Boyd v. State*, 306 Ga. 204, 207 (1) (830 SE2d 160) (2019). Additionally, based on this evidence, the jury was authorized to find that Greene killed Bryant and that the alternative hypothesis that someone other than Greene committed the crimes was unreasonable. See *Garay*, 314 Ga. at 21 (2). Therefore, Greene's challenge to the sufficiency of the evidence as a matter of both constitutional due process and Georgia statutory law fails.

2. Greene next contends that the trial court erred in not suppressing his February 18, 2019 statement to Investigator Hayes because Investigator Hayes failed to give Greene his complete *Miranda* warnings at the outset of that interview. "The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard considering the totality of the circumstances. Although we defer to the trial court's findings of disputed facts, we review de novo the trial court's application of the law to the facts." *Gaddy v. State*, 311 Ga. 44, 46 (2) (855 SE2d 613) (2021) (citation and punctuation omitted).

At the *Jackson-Denno*[10] hearing, Investigator Hayes testified that Greene was taken into custody on February 7, 2019, and before Investigator Hayes interviewed Greene that day, he read Greene his *Miranda* rights. Greene indicated that he understood those rights, signed a waiver of rights form, and agreed to speak with Investigator Hayes. Investigator Hayes testified that he interviewed Greene a second time on February 15, 2019. At the outset of the February 15 interview, Investigator Hayes read Greene his *Miranda* rights, and Greene indicated that he understood those rights and affirmatively waived those rights. According to Investigator Hayes, during the February 15 interview, Greene "changed course"—going from having "no knowledge" of Bryant's death, to having been present when Bryant was killed and "when the body was disposed of." So Investigator Hayes asked Greene whether "he would take [them] out and show [them] the location that [Bryant] was killed," and Greene confirmed that he could.

Investigator Hayes testified that, three days later, on February

---

[10] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

25

18, he and another officer removed Greene from the Douglas County Jail for Greene to lead them to the site where Bryant was killed. Investigator Hayes noted that he had already Mirandized Greene "at least twice," but he briefly recited Greene's *Miranda* rights again before driving to the location in question. Investigator Hayes recorded the interview on a digital voice recorder inside the vehicle. The audio recording of the February 18 interview was then played for the trial court, and in the recording, the following exchange occurred:

> INVESTIGATOR HAYES: Do you understand that you're still under your rights? You still have the right to remain silent. You still have the right to have an attorney with you if I ask you any questions or before you can answer any questions if you like. If you can't afford to hire an attorney, one can be appointed to represent you if you wish. You understand all those rights?
> GREENE: Yes.
> INVESTIGATOR HAYES: OK, having all those rights in mind, you still want to continue with our field trip?
> GREENE: Yes.

After hearing Investigator Hayes's testimony and the audio recording of the interview, the trial court denied Greene's motion to suppress, finding that: (1) Investigator Hayes had previously

advised Greene of his *Miranda* rights during his February 7 and February 15 interviews; (2) during both of the prior interviews, Greene "waived his rights freely and voluntarily, without hope of benefit, [or] fear of injury" and spoke to Investigator Hayes about "the homicide that is at issue in this case"; (3) on February 18, Investigator Hayes gained Greene's "voluntary cooperation" to go to a location "where the victim was originally killed," and "rather than give the full *Miranda* warning," Investigator Hayes "advised" Greene that "the *Miranda* rights still applied and substantially gave the *Miranda* warning"; and (4) Greene "freely and voluntarily agreed to converse with [Investigator Hayes] and go to the location and answer the officer's questions." The trial court ruled that, "under the circumstances of this case," Greene's February 18 statement was "admissible and that [Greene] waived his rights and made the statement voluntarily." The trial court reached the same conclusion in denying Greene's motion for new trial.

On appeal, Greene does not dispute that Investigator Hayes properly advised him of his *Miranda* rights before questioning him

27

on February 7 and February 15 and that he signed a *Miranda* waiver prior to each of those interviews. Greene argues, as he did below, that, on February 18, he did not sign a waiver of rights form and that Investigator Hayes went over the *Miranda* warnings "real quick" while they were driving to the site where Bryant was allegedly killed. Greene contends that Investigator Hayes left out the following rights from the *Miranda* warning: (1) Greene had a right to stop the interrogation at any time, and (2) anything Greene said during the interview could be used against him. Greene asserts that his February 7, February 15, and February 18 interviews were independent—as opposed to one continuous interview—and accordingly, Investigator Hayes "committed an error of constitutional magnitude" when he "outright failed" to advise Greene that anything he said on February 18 could be used against him in a court of law.

The trial court did not err in concluding that Greene knowingly and voluntarily waived his *Miranda* rights on February 18. See *Pender v. State*, 311 Ga. 98, 119 (5) (856 SE2d 302) (2021)

28

(concluding that the record supported the trial court's finding that the appellant "made a knowing, intelligent voluntary waiver of his rights" during his custodial interview and that "the officers were not required to re-read the *Miranda* warnings to [the appellant] before commencing their questioning" eight days later). "Neither federal nor Georgia law mandates that an accused be continually reminded of his rights once he has intelligently waived them." *Ellis v. State*, 299 Ga. 645, 648 (2) (791 SE2d 16) (2016) (citation and punctuation omitted). "Thus, when conducting a follow-up interview or a continuation of a previous interview, a reminder of *Miranda* rights may be permitted in place of a complete restatement." *Gaddy*, 311 Ga. at 47 (2) (citations omitted).

Here, Greene does not dispute that he was fully advised of and knowingly and voluntarily waived his *Miranda* rights prior to his interviews with Investigator Hayes on February 7 and 15, and the record reflects that Investigator Hayes reminded Greene of those rights on February 18. Greene has not shown that, under these circumstances, "the *Miranda* warnings he received" on February 15

29

"became stale" in the three days "between receiving them and [any] incriminating statements he made to the police on" February 18 or that other circumstances arose after Greene was informed of those rights on February 15 which would have rendered his February 18 statements involuntary. *Pender*, 311 Ga. at 119 (5). Therefore, "[b]ased on the totality of the circumstances, the trial court did not err in its determination that" Greene's February 18 statement was "freely, knowingly, and voluntarily given or in its admission" of the statement at trial. Id.

3. Greene also contends that the trial court erroneously admitted other-acts evidence pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)"). We conclude that the trial court did not clearly abuse its discretion in admitting this other-acts evidence at trial, but even if certain of this evidence should not have been admitted, any such error was harmless.

The other-acts evidence admitted at trial involved Greene's prior assaults by strangulation of his ex-girlfriends, Amber Clark and Nadine Pirkle. Clark, who dated Greene in 2017, testified that,

30

when Greene got angry with her, he would strangle her—explaining that it happened "so many" times she "couldn't count" and "[i]t would feel like [she] was about to die." Clark testified that, on one occasion, Greene got angry with her while he was driving her car, and he pulled the car over on the side of the road, at which point Clark exited the car and started running. Greene caught up with Clark and strangled her to the point of unconsciousness, and while she was unconscious, Greene stole Clark's vehicle and left her on the side of the road. When Clark woke up, she started walking, and a police officer stopped and gave her a ride to a friend's house. The police officer testified at trial that Clark indicated there had been a "physical altercation" with someone, but she "denied a report." Clark testified that she did not want to press charges because Greene still had her car, and she was afraid of him. Pirkle also testified that she dated Greene in 2000, and when he got angry with her, he would strangle her—generally "grabb[ing] [her] from behind." Pirkle testified that Greene frequently "choked [her] till [she] passed out," and on one occasion, when Pirkle refused to give

Greene money from her tax refund, he "strangled [her] in front of [her] mother." Pirkle called the police, and the responding officer testified that she arrested Greene and charged him with simple battery.[11]

"We review the trial court's decision to admit evidence pursuant to Rule 404 (b) for a clear abuse of discretion." *Hood v. State*, 309 Ga. 493, 499 (2) (847 SE2d 172) (2020). "Rule 404 (b) is a rule of inclusion, but it does prohibit the introduction of other acts evidence when it is offered for the sole purpose of showing a defendant's bad character or propensity to commit a crime." *Booth v. State*, 301 Ga. 678, 683 (3) (804 SE2d 104) (2017). To that end, "[i]t is well established that other acts evidence is not admissible 'to prove the character of a person in order to show action in conformity therewith,'" but "such evidence is admissible for other purposes, including 'proof of motive, opportunity, intent, preparation, plan,

---

[11] A certified copy of the indictment was admitted at trial, as well as Greene's guilty plea to simple battery.

knowledge, identity, or absence of mistake or accident.'" *Hood*, 309 Ga. at 499 (2) (quoting OCGA § 24-4-404 (b)).

> A party offering evidence pursuant to Rule 404 (b) must demonstrate three things: (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the evidence's probative value is not substantially outweighed by its undue prejudice; and (3) that sufficient proof exists for a jury to find by a preponderance of the evidence that the defendant committed the other act.

Id. (citation omitted).

Here, Greene does not argue that the State failed to satisfy its burden under the third part of the test to show that he committed the other acts against Clark and Pirkle. Therefore, we need only examine the first and second parts of the test to determine whether the other-acts evidence was relevant to an issue other than Greene's character and whether the probative value of the evidence was "substantially outweighed by its undue prejudice." *Hood*, 309 Ga. at 499 (2).

To determine whether evidence is "relevant to an issue in the case other than the defendant's character," *Kirby v. State*, 304 Ga.

33

472, 479 (4) (819 SE2d 468) (2018), we apply OCGA § 24-4-401, which defines "relevant evidence" as evidence that "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Greene argues that relevance can only be established in this context where the other act was committed with the same state of mind as the charged crimes. Greene further argues that, because the intent required for the other acts at issue was not the same as the offenses for which he was charged—namely, malice murder by strangling Bryant and theft by taking for stealing Bryant's car[12]—the other-acts evidence was not relevant for any purpose except to impermissibly show Greene's propensity to commit criminal acts. We disagree and conclude that the other-acts evidence was relevant to the issue of Greene's intent. Because Greene entered a plea of not guilty in this case and "did not take affirmative steps to remove intent as an

---

[12] We note that Greene was also charged with felony murder predicated on aggravated assault for causing the death of Bryant, irrespective of malice, by strangling her.

34

issue," *Hounkpatin v. State*, 313 Ga. 789, 794 (2) (a) (873 SE2d 201) (2022), he made intent "a material issue," and "the State may prove intent by qualifying Rule 404 (b) evidence absent affirmative steps by the defendant to remove intent as an issue." *Hood*, 309 Ga. at 499-500 (2) (citation and punctuation omitted). See also *Naples v. State*, 308 Ga. 43, 51 (2) (838 SE2d 780) (2020) ("We have stated that a defendant who enters a not guilty plea makes intent a material issue, and the State may prove intent by qualifying Rule 404 (b) evidence absent affirmative steps by the defendant to remove intent as an issue." (citation and punctuation omitted)).

As noted above, Greene was charged in this case with felony murder predicated on aggravated assault for causing Bryant's death by strangling her and theft by taking for unlawfully taking Bryant's motor vehicle with the intent to deprive her of it. And "we may consider whether the other acts were relevant to the issue of intent on any of these offenses." *Booth*, 301 Ga. at 683 (3). The charged offense of felony murder predicated on aggravated assault by strangulation involved "similar intent," id., to Greene's prior acts of

strangulation against Clark and Pirkle—acts which could also have constituted aggravated assaults by strangulation.[13] The charged offense of theft by taking for stealing Bryant's car likewise involved "similar intent" to Greene's theft of Clark's vehicle after she passed out from strangulation, which could also have constituted a theft by taking. "The relevance of other[-]acts evidence offered to show intent is established when the prior act was committed with the same state of mind as the charged crime." *Hood*, 309 Ga. at 500 (2) ("Here, the states of mind required for the charged offenses of aggravated assault, aggravated battery, and armed robbery were the same as the states of mind required for the uncharged DeKalb County incident, which could constitute robbery, aggravated assault, and aggravated battery. Therefore, the trial court did not err by ruling that the other acts evidence was relevant to a matter other than Hood's character – her intent."). Phrased another way,

---

[13] Under OCGA § 16-5-21 (a) (3), "[a] person commits the offense of aggravated assault when he or she assaults: . . . [w]ith any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in strangulation . . . ."

"evidence that an accused committed an intentional act generally is relevant to show . . . that the same defendant committed a similar act with the same sort of intent." *Olds v. State*, 299 Ga. 65, 72 (2) (786 SE2d 633) (2016). See also *Booth*, 301 Ga. at 682-683 (3) (explaining that, while the appellant "focuse[d] specifically on the intent required for malice murder," malice murder was "not the only crime for which he was prosecuted in this case and thus for which the State was required to prove intent"). Accordingly, because "the intent required for the charged offense and other acts is the same, and intent is at issue, the first prong of the Rule 404 (b) test [has been] satisfied." Id.

Having concluded that the other-acts evidence was relevant to prove intent and met the first part of the Rule 404 (b) test, "the next step is to weigh its probative value against its prejudicial effect," *Kirby*, 304 Ga. at 481 (4) (a), which "requires evaluation of the other-acts evidence under Rule 403." *Naples*, 308 Ga. at 52 (2).

> Rule 403 provides for the exclusion of relevant evidence where its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or

misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. In other words, other acts evidence should be excluded if it constitutes matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. Factors to be considered in determining the probative value of other act evidence offered to prove intent include its overall similarity to the charged crime, its temporal remoteness, and the prosecutorial need for it.

*Hood*, 309 Ga. at 500-501 (2) (citations and punctuation omitted).

As discussed above, the State was required to prove that Greene intended to assault Bryant by strangling her and to take Bryant's car with the intention of depriving her of this property. And the other-acts evidence related to Clark "was highly probative" on those points "given the overall similarity between the offenses, their temporal proximity, and the prosecution's need for them." *Hounkpatin*, 313 Ga. at 795 (2) (a). The evidence shows that Greene's acts of strangling Clark were "the same type of act alleged to have caused" Bryant's "death." *Hounkpatin*, 313 Ga. at 795 (2) (a). And, while Clark did not ultimately die as a result of the assaults by strangulation and Greene generally used his hands or

38

arm as an instrument—as opposed to a ligature of some kind—when strangling her, see OCGA § 16-5-21 (a) (3), these differences do not alter the striking similarities in Greene's mental state and intent in engaging in these acts of strangulation. Additionally, with respect to the theft by taking charge in this case, the other-acts evidence established that, on at least one occasion after Greene strangled Clark and she passed out, he stole her car and left her on the side of the road. Bryant's car was also stolen after she was strangled and left on the side of the road, and her car was later found in Greene's possession.

The similarities between the acts of strangling Clark and taking her property—i.e., her car—with the intent to deprive her of said property and the theft of Bryant's car following her death by strangulation were substantial. And, "[w]hen other act evidence is introduced to prove intent, [] a lesser degree of similarity between the charged crime and the extrinsic evidence is required" than when it is used to prove identity. *Kirby*, 304 Ga. at 484 (4) (a) (i) (quotation and punctuation omitted). As for temporal proximity, the crimes

charged in this case occurred two years after Greene's violent strangulation of Clark and consequent theft of her car. Given this timeframe and the significant similarities between the Clark incidents and the crimes at issue, the incidents involving Clark were highly probative. See *Hood*, 309 Ga. at 501 (2). And, even if the other-acts evidence involving Clark was not "critical to the State's prosecution," the other-acts evidence proved that Greene acted with intent in assaulting Bryant by strangling her and unlawfully taking her car with the intent to deprive her of this property. *Hounkpatin*, 313 Ga. at 796 (2) (a). See also *Olds*, 299 Ga. at 75 (concluding that the "probative value of evidence derives in large part from the extent to which the evidence tends to make the existence of a fact more or less probable," and "the greater the tendency to make the existence of a fact more or less probable, the greater the probative value") (citations omitted).

We recognize that the other-acts evidence related to Clark was also certainly prejudicial to Greene, particularly since he was not charged with any crimes arising from his assaults on Clark or the

theft of her car, which can increase the prejudicial impact of this evidence. See *Hood v. State*, 299 Ga. 95, 105 (786 SE2d 648) (noting that the danger of admitting extrinsic offense evidence is greater where "the extrinsic activity was not the subject of a prior conviction" because "the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged"). However, "Rule 403's exclusionary force is meant to be applied sparingly—primarily when the other-acts evidence has scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Hounkpatin*, 313 Ga. at 796 (2) (a) (citations and punctuation omitted). "Given the substantial probative value" of this other-acts evidence in proving Greene's intent, "the trial court did not abuse its discretion in determining that unfair prejudice" to Greene did not "substantially outweigh it." Id. at 797 (2) (a).

Under these circumstances, we conclude that the other-acts evidence involving Clark "was not a matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial

41

effect," *Kirby*, 304 Ga. at 484 (4) (a) (i) (quotation and punctuation omitted), and we cannot say that the probative value of this other-acts evidence "was so outweighed by the danger of unfair prejudice that the trial court abused its discretion when it admitted it." *Hood*, 309 Ga. at 501 (citation and punctuation omitted).

Turning to the trial court's admission of Greene's violent acts towards Pirkle, we conclude that, because these acts occurred 19 years before the charged crimes, they were too remote in time to have much, if any, evidentiary value, but any error in admitting this evidence was harmless.

> The test for determining whether a nonconstitutional evidentiary error was harmless is whether it is highly probable that the error did not contribute to the verdict. In conducting this harmless-error review, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done[.]

*Tiraboschi v. State*, 312 Ga. 198, 200 (2) (862 SE2d 276) (2021) (citations and punctuation omitted).

As discussed above in Division 1, the evidence of Greene's guilt, "aside from the other[-]acts evidence" related to Pirkle, was "strong."

42

*Edwards v. State*, 308 Ga. 176, 184 (3) (839 SE2d 599) (2020). Greene's DNA was found underneath Bryant's fingernails and inside her vaginal area—demonstrating that Greene had physical and sexual contact with Bryant, despite his statements to the contrary. And Greene had healing scratch marks on his hands during his first interview with law enforcement. Bryant also had abrasions on her hands at the time of her death, indicating a struggle with someone. Greene was in sole possession of Bryant's car as of the night she was killed, which was confirmed by several witnesses who saw him in the car on the night of the murder and in the days afterward, and Greene purchased a headlight bulb for a car of the same make and model as Bryant's on the day Bryant's body was discovered. Additionally, Greene gave hours of conflicting statements to law enforcement about his activities and whereabouts on January 24 and 25, which were videotaped and played for the jury. In his final account, Greene admitted to being present for Bryant's murder and the disposal of her body, but insisted that Lee—who had an alibi—was the person who killed her. Greene then

43

took law enforcement officers to the location of Bryant's murder—a location he knew well.

Moreover, before the State presented the other-acts evidence and again during the jury charge, the trial court instructed the jury that it could consider the other-acts evidence only for certain limited purposes, including Greene's alleged intent to commit the crimes for which he was charged, but the jury was not permitted to consider the other-acts evidence for any other purpose—to include inferring that Greene was of the character to commit these other acts. The trial court also emphasized that Greene was on trial only for the offenses charged in this case and not for any other act.

"[A]lthough the trial court's limiting instructions did not meaningfully explain" the only "permissible purpose" for which this evidence was relevant, the instructions "did, at least, tell the jury what it could not do," which was to "infer from such evidence that the accused is of a character that would commit such crimes. We have held that this sort of admonition can lower the risk that the jury will convict for the wrong reasons." *Nundra v. State,* --- Ga. --

--, 885 SE2d 790, 797 (2) (March 21, 2023).

> To be clear: because these instructions [were overly broad as to] the permissible purposes for which the evidence could be considered, they do not have the same mitigating effect that we have found in other cases where the trial judge specifically [and appropriately] instructed the jury on which Rule 404 (b) purposes could be considered.

Id. "Even so, the trial court's admonition that the jury may not infer from such evidence that the accused is of a character that would commit such crimes reduces the likelihood that the evidence" of Greene's prior acts "influenced the verdict." Id.

Given the substantial evidence of guilt in this case, including the other-acts evidence involving Clark, we conclude that "it is highly probable" that any error in admitting the other-acts evidence involving Pirkle was harmless and did not contribute to the jury's guilty verdicts against Greene, *Jackson v. State*, 306 Ga. 69, 81 (2) (c) (829 SE2d 142) (2019), and we need not decide whether it was error for the trial court to admit the other-acts evidence for purposes other than proving Greene's intent. See *Tiraboschi*, 312 Ga. at 200 (2) ("We need not decide whether this evidence was erroneously

45

admitted, because any such error was harmless."). Therefore, this contention fails.

4. Greene next contends that the trial court erred by admitting autopsy photographs into evidence that were overly graphic and unduly prejudicial. We see no merit to this contention.

"[W]e generally evaluate the admissibility of autopsy photographs under OCGA §§ 24-4-401, 24-4-402, and 24-4-403." *Mitchell v. State*, 307 Ga. 855, 863 (3) (b) (838 SE2d 847) (2020).

> Pursuant to OCGA § 24-4-402, "[a]ll relevant evidence shall be admissible[.]" To evaluate relevancy, this Court relies on OCGA § 24-4-401, which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, relevant evidence may be excluded under OCGA § 24-4-403 ("Rule 403") if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. The major function of Rule 403 is to exclud(e) matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. Moreover, the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly.

*Lanier v. State*, 310 Ga. 520, 527 (4) (852 SE2d 509) (2020) (citations and punctuation omitted).

Before the medical examiner testified at trial, the State advised the trial court of its intention to introduce autopsy photographs—some of which were graphic in nature—and Greene objected. The trial court then excused the jury and reviewed the photographs the State sought to admit, which reflected traumatic injuries to the exterior and interior of the victim's neck and scalp—including contusions and other extensive bruising—and injuries to the exterior surfaces of the victim's hands and vagina, including skin abrasions and vaginal tearing. The trial court questioned the medical examiner outside the presence of the jury about whether the photographs were "necessary" to his presentation of the evidence regarding the injuries to the victim.

The medical examiner testified that the photographs were necessary because the deep tissue damage and interior injuries to the victim's neck and scalp could not be reflected without peeling back the tissue in the neck and scalp area to demonstrate the extent

of her injuries, which included hemorrhaging caused by ligature strangulation and blunt force trauma. And the tearing and abrasions in the victim's vaginal area—consistent with "sexual penetration"—could not be shown without moving the skin to adequately reflect the external components of that area. The medical examiner also testified that "photographs are always helpful to explain what people aren't used to seeing." The trial court then admitted the photographs, concluding that they were necessary to depict injuries that would be visible only by altering the body.

"Given the medical examiner's testimony, the trial court did not abuse its discretion when it concluded that the autopsy photograph[s] [were] relevant under Rule 401's broad definition." *Mitchell*, 307 Ga. at 864 (3) (b). The trial court also determined that the photographs were necessary for the medical examiner to explain Bryant's injuries, and we cannot say, based upon this finding, that "the trial court abused its discretion in admitting into evidence the autopsy photograph[s] at issue here." Id. at 865 (3) (b). "Further, the photographs were relevant to show the nature and location of

48

the victim['s] wounds, which corroborated the State's evidence of the circumstances of the killing[]." *Lanier*, 310 Ga. at 527-528 (4). Therefore, the trial court did not abuse its discretion by admitting the challenged photographs at trial. See id. at 528 (4).

5. Greene also argues that the trial court abused its discretion in allowing the State to introduce harmful and non-probative evidence to the jury from Greene's cell phone showing that he conducted two internet searches for rape because he was not charged with rape in this case. During trial, the State sought to introduce a photograph of Greene's cell phone browser history showing that he conducted two internet searches related to rape[14] on January 23 and 24, 2019—the day before and day of Bryant's murder. The State argued that the fact Greene conducted these internet searches "help[ed] explain[] what's going on here in this particular crime." Greene objected to the introduction of the photograph of this search history from his cell phone. The trial court excused the jury and

---

[14] The precise time of the searches was not included in the cell phone data.

49

reviewed the evidence in question. The trial court determined that the photograph of Greene's cell phone showing Greene conducted two internet searches, identified on his phone as "'Rape' Search," was admissible as intrinsic evidence, and the photograph was admitted into evidence through the law enforcement officer who conducted the forensics download of Greene's cell phone.

Assuming that the trial court abused its discretion by admitting this photograph of Greene's cell phone into evidence, we conclude that any such abuse of discretion was harmless error and "requires reversal only if it harms" Greene's "substantial rights." *Roberts v. State*, 315 Ga. 229, 238 (2) (c) (880 SE2d 501) (2022) (citation and punctuation omitted).

> [W]e determine whether such harm occurred by asking whether it is highly probable that the error did not contribute to the verdict. As part of that determination, we review all the evidence de novo, after setting aside the evidence admitted in error, and we weigh the remaining evidence as we would expect reasonable jurors to have done[.]

Id. (citations and punctuation omitted).

50

As detailed in Divisions 1 and 3, the evidence of Greene's guilt in this case, apart from the photograph showing the two internet searches, was strong. "In light of this very strong evidence, it is highly probable" that the photographic evidence of the internet search history from Greene's cell phone, while not helpful to Greene, "did not contribute to the verdicts." *Roberts*, 315 Ga. at 239 (2) (c). As such, in light of the other strong evidence presented against Greene at trial, any error in the trial court's admission of this evidence was harmless.

6. Greene contends that the trial court erred by failing to instruct the jury on mere presence and corroboration of a defendant's statement as he requested.[15] However, the record

---

[15] Greene requested the pattern charge on "mere presence," tracking the following language from *Morales v. State*, 281 Ga. App. 18, 19 (1) (635 SE2d 325) (2006):

> A jury is not authorized to find a person who was merely present at the scene of a commission of a crime at the time of its perpetration guilty of consent in and concurrence in the commission of the crime, unless the evidence shows, beyond a reasonable doubt, that such person committed the actual crime, helped in the actual perpetration of the crime, or participated in the criminal endeavor.

Greene also requested the following charge on corroboration: "A defendant's statement unsupported by any other evidence is not sufficient to

reflects that, at the conclusion of the charge to the jury, Greene's trial counsel did not object to the omission of these charges, and thus, our "review of the trial court's instructions is for plain error only." *Palencia v. State*, 313 Ga. 625, 628 (872 SE2d 681) (2022).

To establish plain error in regard to jury instructions, Greene must satisfy the following four prongs:

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Palencia*, 313 Ga. at 628 (citing *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011)). "Satisfying all four prongs of this standard is difficult, as it should be." *Kelly*, 290 Ga. at 33 (2) (a).

_____

justify a conviction."

52

During the charge conference, the trial court explained that it would not give a charge on mere presence unless Greene could point to case law showing that the charge was legally required in this case. Additionally, the trial court advised that it would not give the corroboration charge because Greene had not given a confession, and Greene would "need to find" a case stating that the trial court was required to give such a charge under those circumstances. The following day, Greene informed the trial court that he could not find any case law mandating that the trial court give a charge on mere presence, but he stated that "our request is still obviously in effect." Greene did not mention his prior request to charge on corroboration of a defendant's statement or provide any case law demonstrating that such a charge was appropriate where a defendant has not given a confession. The trial court did not instruct the jury on mere presence or corroboration, and as noted above, Greene did not object at the conclusion of the jury charge.

We conclude that the trial court did not clearly or obviously err in refusing to charge the jury on corroboration because Greene did

not confess to committing the crimes charged. See OCGA § 24-8-823 (providing that "[a] confession alone, uncorroborated by any other evidence, shall not justify a conviction"). See also *English v. State*, 300 Ga. 471, 474 (2) (796 SE2d 258) (2017) (determining that "in a confession, the entire criminal act is confessed"). We further conclude that a failure to give a mere presence instruction is not error where, as here, the trial court instructed the jury that the State was required to prove each element of the crimes charged. See *Simmons v. State*, 282 Ga. 183, 188 (14) (646 SE2d 55) (2007) ("[M]ere presence is only a corollary to the requirement that the State prove each element of the crime charged, and, as the trial court's instructions clearly informed the jury of this requirement, there was no error." (citation omitted)). However, even if the trial court had clearly and obviously erred in not charging the jury on mere presence, Greene has failed to demonstrate that "any such error likely affected the outcome of the trial," and thus, "he has failed to establish plain error." *Clark v. State*, 315 Ga. 423, 440 (4) (883 SE2d 317) (2023) (citation and punctuation omitted).

As detailed above, the evidence presented by the State in this case was substantial, and Greene "has not met his burden of affirmatively showing that the [trial court's] failure to give" a mere presence instruction "probably affected the outcome of his trial." *Lyman v. State*, 301 Ga. 312, 320-321 (2) (800 SE2d 333) (2017). Accordingly, even if there was clear and obvious error, "there is no likelihood that the outcome of the trial would have been different had the instruction in question been given, and, for this reason [], there is no plain error." *Kelly*, 290 Ga. at 34 (2) (b).

7. Finally, because we assumed error in the trial court's admission of the Rule 404 (b) evidence related to Pirkle and the photograph of Greene's cell phone showing his internet search history, we must consider whether the cumulative prejudicial impact of these admissions requires a new trial. See *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020). "To establish cumulative error," an appellant "must show that (1) at least two errors were committed in the course of the trial; and (2) considered together along with the entire record, the multiple errors so infected the

jury's deliberation that they denied" the appellant a "fundamentally fair trial." *Flood v. State*, 311 Ga. 800, 808 (2) (d) (860 SE2d 731) (2021) (citation and punctuation omitted).

Having considered the combined effect of the trial court's errors in this case, we conclude that they do not entitle Greene to a new trial. In light of the harmlessness of the evidentiary errors in question and in light of the other substantial evidence heard by the jury in this case, which included: (1) Greene's repeated denials that he ever touched Bryant, when his DNA was found both underneath her fingernails and in her vaginal area; (2) his possession of her car on the night of her murder; and (3) his multiple, conflicting statements to law enforcement—first insisting he did not know about Bryant's death, then stating that he was present for Bryant's murder—statements the jury was entitled to disbelieve; "it is highly probable that the error[s] did not contribute to the verdict." *Lane*, 308 Ga. at 21 (4). Additionally, Greene has not shown that "the multiple errors so infected the jury's deliberation that they denied" him a "fundamentally fair trial." *Flood*, 311 Ga. at 808 (2) (d).

*Judgment affirmed. All the Justices concur, except Colvin, J., who concurs in judgment only in Division 4, and Peterson, P. J., and Warren and Pinson, JJ., who dissent.*

PETERSON, Presiding Justice, dissenting.

I generally agree with the majority's legal conclusions. Unfortunately, I find myself unable to agree with its more fact-bound conclusions. I therefore respectfully dissent.

A proper Rule 403 analysis would have excluded the Clark Rule 404 (b) evidence. The majority overstates the prosecutorial need for that evidence (and thus its probative value); although intent was *technically* put at issue by Greene's not guilty plea, it was not an *important* issue in the case. Greene's defense was that he didn't do the crime at all, not that he did the act alleged but without culpable intent. See *Olds v. State*, 299 Ga. 65, 69-76 (2) (786 SE2d 633) (2016) (clarifying previous case law to explain that while intent was always technically at issue when a defendant pleads not guilty, that does not mean that intent is an important issue in every such case). And the majority substantially overstates the mitigating impact of a "limiting" instruction that affirmatively told the jurors that they could consider the evidence for a range of impermissible purposes,

including motive, identity, and absence of harm or mistake (purposes that the majority does not contend were permissible).

And the majority is correct that the Rule 404 (b) evidence was "certainly prejudicial." It told the jury that Greene regularly strangled women, the crime with which he was charged here. The jurors were expressly instructed that they could consider that evidence of identity – i.e., that strangling was such a signature crime of his that the fact this victim was strangled was evidence he did it.[16] The Rule 404 (b) evidence also told the jury that he had not previously been held criminally responsible for some of those prior attacks, including because one of the victims was afraid of him. The majority merely acknowledges that there is a greater danger in admitting such evidence without explaining what the danger is; the

---

[16] Evidence admitted for identity under Rule 404 (b) "must be a 'signature' crime, and the defendant must have used a modus operandi that is uniquely his. . . . Evidence cannot be used to prove identity simply because the defendant has at other times committed the same commonplace variety of criminal act." *Brooks v. State*, 298 Ga. 722, 725 (2) (783 SE2d 895) (2016) (citations and punctuation omitted); see also *Williams v. State*, 313 Ga. 443, 447-448 (1) (870 SE2d 397) (2022) (same). That is absent here, of course; the Rule 404 (b) evidence showed that Greene strangled Clark and Pirkle with his hands, and the victim here was strangled with an instrument.

danger is that there was a high risk that the jury would convict Greene not for the charged offense but for the extrinsic acts. See *Kirby v. State*, 304 Ga. 472, 485 (4) (a) (i) (819 SE2d 468) (2018) ("[T]he risk that a jury may convict a defendant not for the offense charged but for his extrinsic conduct is greater where the extrinsic conduct was not already the subject of a conviction.").

The majority presumes that admission of the Pirkle Rule 404 (b) evidence and Greene's search for rape pornography were error; in my view, they were in fact error.[17] A cumulative harm assessment, then, must consider the harm of the Clark evidence, the Pirkle evidence, and the search for rape pornography. And that assessment must also recognize that because those errors were preserved by trial counsel, the State bears the burden of showing that those errors, in combination, were highly probable not to have

---

[17] Underlying much of the State's case was at least a subtext of sexual assault. But Greene was not charged with any sexual offense. Although the State's medical examiner who conducted an autopsy of the victim testified that the victim had injuries to her vagina, when asked whether he could "say whether that penetration's consensual or nonconsensual," the medical examiner responded, "I cannot."

contributed to the verdict. See *Jackson v. State*, 306 Ga. 69, 81 (2) (c) (829 SE2d 142) (2019).

The State has not made that showing. Although the majority characterizes the evidence against Greene as "very strong," almost all of it was circumstantial. The strongest evidence, I think, was the evidence of the scrapes on Greene's hands and the presence of his DNA under the victim's fingernails. In my view, the evidence against him was plainly sufficient for federal due process purposes. But constitutional sufficiency is a much lower bar than a showing of harmlessness.

Standing alone, the Rule 404 (b) evidence was certainly prejudicial, but the cumulative impact of the evidence was heightened because it portrayed Greene not just as a strangler, but as serial strangler who had been committing violent crimes for almost 20 years. See *Kirby*, 304 Ga. at 486 (4) (a) (ii) (the resulting prejudice from the Rule 404 (b) evidence substantially outweighed its scant probative value because the evidence suggested the defendant was a serial criminal who kept committing dangerous

crimes). And the search for rape pornography additionally painted him (quite possibly accurately, albeit irrelevant to any charge here) as someone who enjoyed harming women sexually.

All of this was powerful. And we have no idea how the State used it, because closing arguments were not transcribed.[18] But it is not reasonable to assume that this powerful evidence would not have been used to significant advantage for those impermissible purposes that the jury was instructed the State could use it. "Where evidentiary error is deemed harmless, it is often true that the evidence was only 'marginal' to the prosecution's case." *Thompson v. State*, 302 Ga. 533, 542 (III) (A) (807 SE2d 899) (2017) (quoting *Johnson v. State*, 301 Ga. 277, 280 (800 SE2d 545) (2017)); compare *Jackson*, 306 Ga. at 80 (holding Rule 404 (b) evidence harmless even in absence of transcript because the "prosecutor did not need to rely

---

[18] In briefing on appeal, both the District Attorney's Office that tried the case and the Attorney General focus their arguments regarding the other-acts evidence as being admissible for the purpose of establishing identity, arguing that identity was the central issue in the case because Greene denied killing the victim, there were no eyewitnesses to the incident, no one could place Greene at the scene of the crime, and the murder weapon was never found.

on the [Rule 404 (b) evidence] in his closing argument, because there was solid direct evidence" and "compelling circumstantial evidence"). The State has not shown that this powerful, inadmissible evidence was highly probable not to have contributed to the verdict. Accordingly, I must respectfully dissent.

I am authorized to state that Justice Warren and Justice Pinson join in this dissent.